**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

GREATER BOSTON LEGAL SERVICES, INC.; RIAN IMMIGRANT CENTER, INC.; FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT; AMICA CENTER FOR IMMIGRANT RIGHTS,

*Plaintiffs*,

v.

MARKWAYNE MULLIN, in his official capacity as U.S. Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

*Defendants*.

C.A. No. ____________

**COMPLAINT FOR APA, INJUNCTIVE, AND DECLARATORY RELIEF**

## INTRODUCTION

1. This case is about the federal government's disappearance of thousands of detained people, cutting them off from contact with their lawyers and loved ones.

2. On or about September 15, 2026, the United States Department of Homeland Security ("DHS") disappeared thousands of people, pursuant to a sudden change in policy: after 16 years of making the location of detained people in DHS custody publicly available via its Online Detainee Locator System ("ODLS"), the agency abruptly changed course, no longer disclosing such information for detained people with administratively final orders of removal in response to inquiries on ODLS (hereinafter, the "ODLS Final Order Policy" or "Policy").

3. The effect of this policy change has been profound. Overnight, thousands of people in detention vanished from ODLS, leaving family members and attorneys to scramble to find their loved ones and clients, attempting to confirm that they had not been transferred, removed, or had some other harm befall them. The damage caused by the ODLS Final Order Policy compounds each time a new person with a final order of removal is detained.

4. The Policy is a direct barrier to attorney access. By refusing to disclose the location of clients and potential clients, DHS has left attorneys in the dark and unable to communicate with these people. This mass disappearance—impacting thousands of people in DHS custody—appears to be an effort by DHS to aid in its mass deportation campaign, and to avoid judicial oversight: disappear the clients, and the opportunities for judicial intervention and oversight diminish.

5. Defendants are causing significant, ongoing, and irreparable harm to legal service providers who represent noncitizens, including people with final orders of removal. These legal service providers have been forced to rework their systems and procedures in order to work with detained clients with final orders of removal. Legal service providers are spending significantly more time trying to locate clients who have gone missing because of the ODLS Final Order Policy. The disappearance of clients from ODLS has also impeded legal service providers' ability to offer services to and advocate for them, as service providers are unable to timely locate and communicate with clients who have final orders of removal.

6. The ODLS Final Order Policy has also impeded legal service providers' ability to take on new clients. Because there is no way to immediately or reliably verify the location of a detained person with a final removal order, legal service providers have struggled to find and schedule intake and follow-up calls with potential clients seeking assistance. These legal service providers have been forced to develop alternative, more time-intensive, and less reliable methods

for locating people who may need their services. In some cases, they have ultimately not been able to locate potential clients at all.

7. Plaintiffs are four legal service providers who are suffering and/or will likely suffer such harms as a result of the ODLS Final Order Policy.

8. Defendants have a history of obstructing access to counsel, moving detained people across the country without any notice, and holding them in places no lawyer can access. Now, by removing detained people with final orders of removal from ODLS, without another reliable means of locating them, DHS has made its network of detention centers an even more impenetrable abyss in which people cannot be located by their loved ones or counsel. This policy is unlawful and inhumane.

## JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2201 (Declaratory Judgment Act); and 5 U.S.C. § 701 et seq. (Administrative Procedure Act).

10. Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and federal officers of the United States acting in their official capacities, and because Plaintiffs Greater Boston Legal Services and Rian Immigrant Center are incorporated and have their principal place of business in this district.

11. This Court has the authority to grant the relief requested by Plaintiffs under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; and the Court's inherent equitable authority.

## PARTIES

12. **Plaintiff Greater Boston Legal Services, Inc. ("GBLS")** is a nonprofit organization based in Boston and Cambridge, Massachusetts. GBLS provides free legal services to people in the Greater Boston area. GBLS and its predecessor organizations have been providing immigration-related services to people in Massachusetts since its inception in approximately 1900. GBLS's core work is to provide legal services to people living in poverty, so they can secure the basic necessities of life, such as food, safety, and housing. As a part of that work, GBLS directly represents detained people in their immigration cases, including representation in bond proceedings; in district courts in habeas proceedings; in family court; in their immigration benefits adjudication before U.S. Citizenship and Immigration Services ("USCIS"); and, in advocacy related to conditions of confinement.

13. **Plaintiff Rian Immigrant Center, Inc. ("Rian")** is a nonprofit organization based in Boston, Massachusetts. Rian provides free or low-cost immigration-related services to people across Massachusetts. Rian's core work focuses on providing legal services to immigrant and refugee families to help them build pathways towards security and stability in their new homes. Rian represents people in various types of immigration proceedings, including applications for relief to USCIS and related state family court representation.

14. **Plaintiff Florence Immigrant and Refugee Rights Project ("FIRRP")** is a nonprofit organization headquartered in Tucson, Arizona, with offices in Phoenix and Florence, Arizona. FIRRP provides free legal and social services to adults and unaccompanied children in immigration custody in Arizona. Its core work focuses on ensuring that noncitizens in immigration detention have access to counsel, understand their legal rights, and are treated fairly and humanely. FIRRP directly represents detained people in their immigration cases, in district court habeas

proceedings, before USCIS, and in asserting their rights to constitutional conditions of confinement. FIRRP's work also includes representing significant numbers of noncitizens deemed incompetent to represent themselves due to mental health needs or disabilities. FIRRP creates *pro se* materials and provides *pro se* assistance to noncitizens detained in Arizona, including group orientations and workshops that enable people to assert their rights to constitutional conditions of confinement and to represent themselves in immigration-related proceedings.

15. **Plaintiff Amica Center for Immigrant Rights ("Amica Center"),** formerly Capital Area Immigrants' Rights Coalition, is a nonprofit organization based in Washington, D.C. Its core work confronts the impact of the immigration system on its clients and communities through direct representation, Know Your Rights presentations, civil litigation, mentorship, and *pro se* support. Amica Center directly litigates habeas cases across the country and co-coordinates a national habeas placement program for people detained in the D.C., Maryland, and Virginia area. Amica Center also defends the rights of detained people through systemic and class action litigation. Amica Center provides full legal representation for unaccompanied immigrant children who are in the custody of the Office of Refugee Resettlement ("ORR") and detained adults, and serves as appointed attorneys for people living with mental or cognitive developmental health conditions. In this capacity, Amica Center attorneys represent people in their immigration cases, including seeking bond, and on other issues, such as challenging their conditions of confinement.

16. Each Plaintiff represents current clients and seeks to represent prospective clients who have final orders of removal, who are in the custody of Defendants and/or might at any time be arrested by Defendants and/or their agents and placed in custody.

17. **Defendant Markwayne Mullin** is the Secretary of the U.S. Department for Homeland Security ("DHS"). Secretary Mullin is responsible for the administration of U.S.

immigration laws. He directs each of DHS's components, including the components responsible for the apprehension, detention, and removal of noncitizens. Secretary Mullin is responsible for ensuring that DHS and its component agencies provide attorney access in accordance with law. He is sued in his official capacity.

18. **Defendant U.S. Department of Homeland Security** is a federal cabinet-level department of the U.S. government. DHS is an "agency" within the meaning of the Administrative Procedure Act ("APA"). 5 U.S.C. § 551(1). It is the largest federal law enforcement agency, and it is responsible for administering U.S. immigration laws under the Immigration and Nationality Act ("INA") and federal regulations, including those relating to the apprehension, detention, and removal of noncitizens. Its components include U.S. Immigration and Customs Enforcement ("ICE"). DHS is responsible for providing attorney access in accordance with law across all its component agencies.

19. **Defendant David Venturella** is the Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement. Defendant Venturella oversees all ICE personnel and is a supervisory official responsible for overseeing immigration enforcement, including apprehension, detention, and removal of noncitizens both near the border and in the interior of the United States. Defendant Venturella is responsible for ensuring that ICE and its detention facilities provide attorney access in accordance with law. He is sued in his official capacity.

20. **Defendant U.S. Immigration and Customs Enforcement** is a component agency of DHS and an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is responsible for the apprehension, detention, and removal of noncitizens both near the border and in the interior of

the United States. ICE is also responsible for ensuring its officers and facilities provide attorney access that complies with the rule of law.

## STATEMENT OF FACTS

### A. DHS's sprawling network of detention facilities

21. DHS has a wide network of privately owned and contracted detention centers across the country administered by its component agency ICE. In addition to its long-term detention centers, ICE routinely detains people at hold rooms—sometimes for days at a time, in abysmal conditions[1]—as well as hospitals, hotel rooms,[2] and local and county jails. Increasingly, ICE has used novel detention settings, including military bases, state-run facilities, and soft-sided camps. ICE itself has identified over 200 detention centers in use; other data suggests that there are more than 400 active facilities that ICE uses.[3]

22. ICE frequently transfers people in its custody between detention centers, transporting them hundreds or thousands of miles away from their communities and loved ones.[4] In September 2026, ICE conducted over 1,200 domestic transfer flights across 54 U.S. cities, with

---

[1] *See, e.g.*, *Mercado v. Mullin*, No. 25-cv-6568, 2026 WL 2874458, at *19, n.248, *23 (S.D.N.Y. Sept. 24, 2026); *Pablo Sequen v. Albarran*, 810 F. Supp. 3d. 1084, 1107–08 (N.D. Cal. 2025); *D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 589 (D. Md. 2026).

[2] *See* Shannon Hefferman & Lauren Villagran, *ICE Is Detaining Children in Hotels Where Families and Lawyers Can't Find Them*, Marshall Project (Oct. 8, 2026), https://www.themarshallproject.org/2026/10/08/ice-trump-children-hotels-detain-families.

[3] *See* U.S. Immigr. & Customs Enf't, *Detention FY 2026 YTD, Alternatives to Detention FY 2026 YTD and Facilities FY 2026 YTD, Facilities FY26*, https://www.ice.gov/doclib/detention/FY26_detentionStats07202026.xlsx [https://perma.cc/MJ8G-9GM9] (last visited Oct. 27, 2026); Vera Inst. Of Just., *ICE Detention Trends* (Aug. 28, 2026), https://www.vera.org/ice-detention-trends [https://perma.cc/6BPX-QKUN].

[4] Human Rights First, *ICE Flight Monitor*: *August 2026 Report* (Sept. 15, 2026), https://cdn.sanity.io/files/1e7vpawz/production/996bfbd458f3f6431c2802c1c4db409947c309cc.pdf [https://perma.cc/ZRM6-B2HS].

an average of 42 such transfer flights per day.[5] Many people are transferred multiple times during their time in ICE custody.[6]

23. All told, DHS has a vast and opaque system of detention facilities where it detains people, including those with final orders of removal.

**B. People with final orders of removal still need access to counsel**

24. A person who has been ordered removed from the United States has an administratively final removal order once their appeal has been dismissed by the Board of Immigration Appeals (BIA), they have waived appeal, they have missed the time to file an appeal or, *inter alia*, they have been ordered removed *in absentia.* 8 C.F.R. § 1241.1.

25. The need for legal representation does not end when a person has been ordered removed. Oftentimes, people with final orders of removal still have a number of legal remedies that they can pursue to challenge their custody and/or potentially remain in the United States.

26. People with administratively final orders of removal retain a number of immigration-specific avenues for relief from deportation: they may file motions to rescind their removal order and reopen their immigration proceedings, 8 C.F.R. § 1003.23; file petitions for review, 8 U.S.C. § 1252; seek relief from removal to third countries; or seek other affirmative immigration relief, such as visas for survivors of crimes in the United States.

27. People with final removal orders may also challenge the legality of their detention through a petition for a writ of habeas corpus. 28 U.S.C. § 2241. Habeas relief is important to those with final removal orders, and certain forms of habeas relief are available exclusively to those with

[5] Human Rights First, *ICE Flight Monitor*: *September 2026 Report* 8–9 (Oct. 19, 2026), https://cdn.sanity.io/files/1e7vpawz/production/099567a36056b4d604d4bbbea398a83c1e1e8377.pdf [https://perma.cc/F3WP-P3RB].

[6] *See, e.g.*, Alla Abdullahi & Geoff Hing, *ICE Detained Them, Then They Vanished*, The Marshall Project (June 1, 2026), https://www.themarshallproject.org/2026/06/01/ice-transparency-immigrants-disappear-transfers [https://perma.cc/F37D-RN99].

final orders. *See Zadvydas v. Davis*, 533 U.S. 678, 699 (2001) (recognizing that people with final orders of removal to countries that will not accept them could face "indefinite, perhaps permanent, detention" and establishing a means to petition for habeas relief presumptively applicable for those detained more than 180 days after a final order of removal). Habeas petitions generally must be filed in the U.S. district court with jurisdiction over their current place of confinement. *Trump v. J. G. G.*, 604 U.S. 670, 672 (2025).

28. In addition, noncitizens with final orders of removal may have other legal matters unrelated to their immigration proceedings. For example, they may have civil or criminal cases pending in local, state, or federal court, or family matters before family courts, which require their participation and communication with counsel. *See, e.g.*, *Doe v. U.S. Dep't of Homeland Sec.*, C.A. No. 24-259, 2025 WL 360534, at *10 (W.D. Pa. Jan. 31, 2025) (granting preliminary relief for detained immigrants who were deprived of remote participation in their state criminal matters).

29. Noncitizens—including those with final removal orders—are also entitled to challenge any violation of their rights they are subjected to while in the government's custody, both through administrative means and in court. For example, noncitizens in detention may be denied access to necessary medication or care, may not be provided requisite disability accommodations, or may face abuse by staff, and frequently face broken reporting systems for mistreatment. These noncitizens require access to their attorneys to remedy such conditions—whether through federal lawsuits or through the variety of administrative mechanisms that Defendants purport to make available, such as the ICE Office of Professional Responsibility ("OPR"), DHS Office of the Inspector General ("OIG") and Office of Civil Rights and Civil Liberties ("CRCL").

**C. The Online Detainee Locator System**

30. As the federal government expanded civil immigration detention to more facilities across the country, DHS created the ODLS in or around 2010.

31. Prior to the launch of ODLS, the only way family members and attorneys could determine the location of a person in civil immigration detention was by directly contacting an office of ICE Enforcement and Removal Operations ("ERO").[7] ERO would then provide location information for people in detention. ERO provided this information regardless of a person's immigration status, including for people with final orders of removal.

32. In June 2010, the federal government established ODLS as a web-based system owned and operated by ICE. *See* Privacy Act of 1974; Department of Homeland Security United States Immigration Customs and Enforcement-011 Immigration and Enforcement Operational Records System of Records, 75 Fed. Reg. 23,274 (May 3, 2010). ODLS was intended to enable members of the public, including family members and attorneys, to more easily and efficiently locate people who were in civil immigration detention. When it was first established, ICE stated that it had "developed ODLS as a service to the public, especially family members and legal representatives, to help locate individuals arrested for administrative immigration violations and who are in or have recently left ICE custody . . . . Currently, members of the public must contact a DRO field office by phone to determine the location of a detainee. With the deployment of this automated system, the public will be able to locate detainees more quickly and efficiently through an online query." *Id* at 23,274.

33. An additional benefit of ODLS was, in ICE's own words, to "support the sharing of information about ICE detainees for the purpose of allowing family members and other people

[7] U.S. Immigr. & Customs Enf't, *Locating Individuals in Detention* (Aug. 8, 2023), https://www.ice.gov/factsheets/locating-individuals-in-detention [https://perma.cc/3ZR7-WT6Q].

to deposit money in detainee accounts for telephone and commissary services within a detention facility." *Id.* at 23,275.

34. There are two ways to locate a person in ODLS. First, a person can be located by entering their country of birth and their "A-number," a unique nine-digit immigration identification number. Alternatively, a person can be located by entering their full name, country of birth, and date of birth. Only exact data matches will appear in the search results.

35. ODLS is available online at https://locator.ice.gov/odls/ and is accessible 24 hours a day, seven days a week. It is available in eleven different languages.

36. ODLS works by extracting real-time data from the ICE Enforcement Integrated Database, which contains information about people held in ICE or U.S. Customs and Border Patrol ("CBP") custody.[8] Pursuant to ICE policy, all information pertaining to the release, removal, or transfer of detained people must be entered into the Enforcement Integrated Database within eight hours of the action.[9]

37. When a person's data is entered as a query in the ODLS website, ODLS automatically runs that query against data in the ICE Enforcement Integrated Database. Prior to the ODLS Final Order Policy, if the information entered exactly matched a person over the age of 18 in the database, ODLS would display the person's name, country of birth, A-number, custody status, state where the person is detained, and the current detention facility. The "Current Detention

[8] *See* U.S. Dept. Homeland Sec., *Privacy Impact Assessment for the Online Detainee Locator System*, DHS Ref. No. DHS/ICE/PIA-019, 16 July 2025, at 2 https://www.dhs.gov/sites/default/files/2025-07/25_0716_priv_pia-ice-019-odls.pdf (last visited Oct. 24, 2026) [hereinafter, "DHS Privacy Assessment"].

[9] *See* U.S. Immigr. & Customs Enf't, *About the Detainee Locator / FAQs*, https://locator.ice.gov/odls/#/about?includeCBP=true&moreInfoNoResults=https:%2F%2Fwww.cbp.gov%2Fborder-security%2Falong-us-borders%2Fmissing-migrant-program [https://perma.cc/HHE9-E8J3] (last visited Oct. 27, 2026) (explaining that "ODLS information may be up to eight hours old," and "ODLS is updated from other ICE systems in near real time").

Facility" field provided a link to additional information about how to contact people detained at that location.




38. If the information entered did not match a person over the age of 18 in the database, ODLS would display "Search Results: 0."




39. Until recently, ODLS provided information for all people in immigration detention over the age of 18, with the exception of those protected under 8 U.S.C. § 1367 who are seeking immigration benefits as survivors of trafficking, domestic abuse, or other crimes.[10]

[10] *See DHS Privacy Assessment*, *supra* note 8 at 2 & n.3.

**D. The ODLS Final Order Policy**

40. On information and belief, on or about September 15, 2026, Defendants made an unprecedented and intentional policy change to limit the information provided through ODLS.[11]

41. On information and belief, Defendants made this policy change in secret, without any public disclosure of the change, or any notification to detained people or their lawyers about the impending change that would impact them and their clients.

42. On or about September 15, Defendants issued a directive, the ODLS Final Order Policy, that custody information for any detained people with administratively final removal orders would no longer appear to the public on ODLS, with the exception of those detained at "a detention facility in Adelanto, California or at temporary holding facilities in Minneapolis, New York City or suburban Chicago[.]" [12]

43. On information and belief, the ODLS Final Order Policy also includes explicit instructions that if officers are asked by attorneys or family members about the location of a detained person with a final order, they should refuse to provide the location of that person.[13]

44. On information and belief, the ODLS Final Order Policy applies to anyone in ICE custody who has received an administratively final removal order, except those at four exempted facilities. As noted above, a removal order issued by an immigration judge generally becomes administratively final when (i) the person waives appeal of the order or otherwise fails to appeal it within 30 days, or (ii) the person appeals the order to the BIA and the BIA denies the appeal. *See* 8 C.F.R. § 1241.1.

---

[11] *See* Ryan J. Foley, *ICE Hides Location of Thousands of Detainees with Final Removal Orders*, Associated Press (Sept. 21, 2026), https://apnews.com/article/ice-detainee-locator-disappear-removal-orders-c3329a70bce424879bc5880b286c019c [https://perma.cc/LJX5-K47U].

[12] Foley, *supra* note 11.

[13] *See* Maria Sacchetti & Liam Bowman*, Immigrants with final deportation orders disappear from ICE detainee locator, Wash. Post* (Sept. 21, 2026), https://www.washingtonpost.com/immigration/2026/09/21/immigrants-with-final-deportation-orders-disappear-ice-detainee-locator/ [https://perma.cc/KWR3-RDJ4].

45. On information and belief, the ODLS Final Order Policy also applies to people in ICE custody who have been issued removal orders *in absentia*, even if the removal proceeding was marred by procedural defects such as a failure to provide the person with actual and timely notice of the hearing at which they were purportedly not present.[14]

46. Defendants have failed to publish or otherwise make publicly available the language of the ODLS Final Order Policy, creating uncertainty in the immigrant community about the specific details and scope of the policy. Moreover, ODLS still suggests that the tool can be used "to locate a detainee who is currently in ICE custody or who has been in U.S. Customs and Border Protection's custody for more than 48 hours."[15] It does not disclose the exclusion of thousands of people pursuant to the ODLS Final Order Policy from ODLS.




---

[14] Giulia McDonnell Nieto del Rio, '*It was complete disarray': Chaos, disruption at Chelmsford immigration court*, Boston Globe (Sept. 18, 2026), https://www.bostonglobe.com/2026/09/19/metro/immigration-court-chaos.

[15] U.S. Immigr. & Customs Enf't, *Online Detainee Locator System*, https://locator.ice.gov/odls/#/search [https://perma.cc/E4TJ-PL8Y] (last visited Oct. 27, 2026).

47. On September 30, 2026, 47 members of Congress sent a letter to Defendant Venturella urging ICE to reverse the ODLS Final Order Policy and restore information to the ODLS system.[16]

48. The letter from members of Congress requested that Defendant Venturella produce a copy of the Policy by October 14, 2026. On information and belief, Defendant Venturella has not responded to the members' request.

49. The ODLS Final Order Policy impacts both people already in ICE custody, and those who will be detained in the future. And the numbers are staggering: in July 2026, there were on average 66,904 people in ICE detention each day, and an average of 21,700 of those people had final orders of removal.[17] That means the ODLS Final Order Policy appears to have disappeared approximately 32 percent of all people in ICE custody—likely over 20,000 people—the very first day it was implemented.

50. Not only has ICE apparently disappeared tens of thousands of people in its custody, but it will continue to do so until the ODLS Final Order Policy is stayed or vacated. As ICE pushes to meet its reported daily quota of 3,000 arrests,[18] thousands of people with final orders will be detained and disappeared while the Policy remains in effect. For example, in July 2026, the latest

---

[16] Press Release, Rep. Veronica Escobar, *Representatives Escobar, Rivas Lead 45 of Their Colleagues in Demanding ICE to Restore Detainee Details Back to ODLS* (Sept. 30, 2026), https://escobar.house.gov/news/documentsingle.aspx?DocumentID=3375 [https://perma.cc/W3R4-R73W].

[17] Deportation Data Project, *Average daily number in ICE detention by month*, https://app.deportationdata.org/?agency=ice&dataset=detention-stays&tab=chart&s=eJxVyEsKgCAUQNG93LGBFRS8zTyExIT8UCJEtPfGneF56MhsuJprCK4H3Vw8bgwtJo-QSm47huALgmou2atiCGf9R6oIk52Wwa6DHXk_ThgbrA [https://perma.cc/GUM2-7S82] (last visited Oct. 27, 2026); Deportation Data Project, *Average daily number in ICE detention by month, filtered by final order*, https://app.deportationdata.org/?agency=ice&dataset=detention-stays&tab=chart&s=eJxVysFqAjEUQNF_uesnTC208HaFdtuNKxEJwXmOkUwSMnFgkPl3wYXg9nDuzOinMDXfUPw8uN6HuCC0MBrKmFO7IAyWUZxLOZlzCEMt7zAWlG23_dp035vuA-EcYrM6oXfaUgxlqPlWEE45XVF-_n8RTpcQ-2oJPbxivUV7vohyDslHl2tv1S02uZQRckEJCWH2EWX_t2M9rusD3PFBpQ [https://perma.cc/G98E-MF9R] (last visited Oct. 27, 2026).

[18] *See* Priscilla Alvarez & Michael Williams, *ICE Agents Told To Ramp Up Daily Immigration Arrests Despite GOP Unease As Midterms Near*, CNN (Oct. 8, 2026), https://edition.cnn.com/2026/10/08/politics/ice-immigration-arrests [https://perma.cc/7F4F-ASK8].

month for which data is available, Defendant ICE placed 13,788 new people with final orders of removal in detention.[19]

51. This harm is compounded by the government's tactics to increase the number of removal orders, such as by scheduling "mega masters"—accelerated master calendar hearings for groups ranging from dozens to 100 or more people in removal proceedings with little to no notice, leading to increased numbers of *in absentia* removal orders.[20] The Executive Office of Immigration Review's ("EOIR") own data indicates that the number of *in absentia* removal orders (which are administratively final orders) have skyrocketed, with an average of 31,319 new *in absentia* removal orders issued each month in 2026.[21]

52. Various alternatives to attempt to contact ICE or discern the location of a detained person—such as calling or emailing ICE directly, calling ICE's Detention and Removal Information Line ("DRIL") hotline, or relying on ERO eFile— are not generally viable.

53. On information and belief, an "alternative" to ODLS that involves contacting ICE is unlikely to be meaningful or effectively give notice of the impacted detainees' location because the ODLS Final Order Policy apparently includes a directive to ICE officers not to disclose to the public the location of detained people with final orders of removal.[22]

---

[19] Deportation Data Project, *Number of Book-Ins to ICE detention by month, filtered by final order before book-in*, https://app.deportationdata.org/?agency=ice&dataset=detention-stays&tab=chart&s=eJxVzsFKw0AQgOF3-c9biBUU5iZ49gVEljadpKubmWWyEaTk3YUeBK8_3-G_8Y08JtZ-6gijb9bz2f2r2Eqil0URFrd-JTGrI-RsbpoziTna_7A0hONwfDoMz4fhgcRUatdYkRv9pynCHL41EqPbJ8LL2yuJ8VrqJdSQ9z8YW9W7qwhTsVPNHheNfNbJQ--fuRgJbwhlzT02Zf_Y91-2A0Wa [https://perma.cc/KY9W-7Y3V] (last visited Oct. 27, 2026).

[20] *See, e.g.*, Ximena Bustillo, *Immigration Courts Are Using a New Tactic to Speed Up Deportations*, NPR (May 26, 2026), https://www.npr.org/2026/05/26/nx-s1-5830474/trump-immigration-courts-mega-masters [https://perma.cc/KG8D-DWEY]; Joseph Gunther & Brandon Marrow, *In July, Mega Master Hearings and Absentia Removal Orders Continued at a Rapid Pace*, bklg: Blog (Aug. 21, 2026), https://bklg.org/blog/mega-masters-july-2026/ [https://perma.cc/8AUT-6FUV] (reporting 54,512 *in absentia* removal orders were issued in July 2026, with 916 *in absentia* removal orders issued out of the Boston immigration court).

[21] Exec. Off. for Immigr. Rev., *Adjudication Statistics: In Absentia Removal Orders* (July 24, 2026), https://www.justice.gov/eoir/media/1344881/dl?inline [https://perma.cc/C7QE-3HDH].

[22] *See* Sacchetti & Bowman, *supra* note 13.

54. Moreover, ICE created ODLS precisely to avoid having ICE officers' time absorbed by answering calls from family members and attorneys looking for their clients. 75 Fed. Reg. 23274–23279 (May 3, 2010). And now, calls to numerous ICE Field Offices lead to long wait times on hold, sudden hang-ups, a general lack of information or no answer at all.

55. Calling DRIL fares no better. First, it is only available "Monday through Friday (excluding holidays) from *8 a.m. to 8 p.m*. (Eastern Time)."[23] Second, upon information and belief, the tool that DRIL operators use to locate a detained person *is ODLS*, so when someone is excluded from ODLS, DRIL operators cannot give out their information either. Attorneys who have called DRIL in an attempt to locate a client or potential client with a final order of removal have been directed to ODLS or have been told that ODLS shows that their client is not in custody.

56. Attorneys have also attempted to use the ERO eFile platform—typically used to schedule legal calls—as a workaround to determine the location of detained people in light of the ODLS Final Order Policy.[24] However, this workaround does not appear to consistently provide locations for impacted detainees and, at best, only identifies a detention location if the person is at one of the approximately 46 participating facilities, which account for a small percentage of the hundreds of detention facilities in which ICE detains people.[25] Furthermore, it usually takes about 48 hours for a detained person to appear in ERO eFile after arriving at a participating facility.

57. The consequences of the ODLS Final Order Policy go beyond the ability of detained persons to communicate with their lawyers.

---

[23] U.S. Immigr. & Customs Enf't, *Contact ICE About Immigration Enforcement Concerns* (July 1, 2026), https://www.ice.gov/enforcementconcerns [https://perma.cc/NF73-J3W2].

[24] *See* U.S. Immigr. & Customs Enf't, *ERO eFile*, https://eroefile.ice.gov/eroefile [https://perma.cc/3AUS-RPC5] (last visited Oct. 27, 2026).

[25] *See* U.S. Immigr. & Customs Enf't, *List of Participating Facilities*, https://www.ice.gov/eroefile/dfas (last visited Oct. 27, 2026).

58. For example, the disappearance of detained persons with final orders of removal has impacted people's criminal proceedings in some states, where judges have had no proof that the person cannot attend the proceeding due to their being in ICE custody. As a result, bench warrants are often issued in the criminal proceedings.

59. In certain districts, federal courts adjudicating habeas petitions rely on ODLS to confirm that petitioners remain in ICE custody in the district and to manage their dockets. *See, e.g.*, *Sendra Gonzalez v. Miami ICE Field Office Director*, No. 1:26-cv-23385, ECF No. 21, at 4 (S.D. Fla. Oct. 6, 2026) ("[The ODLS Final Order Policy] does not appear to serve any real purpose other than to obfuscate the Court's ability to ascertain its jurisdiction—while also impeding the ability of family members, legal representatives, and members of the public to locate those detained by ICE.").

**E. Defendants' unlawful policy harms Plaintiffs and interferes with their core business activities**

60. Plaintiffs seek to safeguard a critical First Amendment right–the ability to communicate with people the government chooses to detain–and to set aside unlawful agency action. Through this action, Plaintiffs do not seek review of their clients' removal orders, the decision to detain their clients, or the process through which their clients' removability will be determined.

61. Plaintiffs GBLS, Rian, FIRRP, and Amica Center are nonprofit legal service providers that provide a variety of services to noncitizens, including people who have final orders of removal, many of whom are already detained or are at risk of detention. They all provide free or low-cost legal services to noncitizens, including representation, and sometimes *pro se* support, in their immigration proceedings and before USCIS. Plaintiffs GBLS, FIRRP and Amica additionally represent people in habeas corpus petitions in federal court and provide *pro se* support.

62. Plaintiffs have all been impacted by the ODLS Final Order Policy, and the Policy will continue to directly interfere with Plaintiffs' core business activities of providing noncitizens with zealous legal representation. For several Plaintiffs, the ODLS Final Order Policy may also impact their ability to meet their contractual obligations and seek renewed funding. The ODLS Final Order Policy has and will continue to cause Plaintiffs irreparable harm.

63. *First*, the ODLS Final Order Policy has impacted or will impact Plaintiffs' ability to communicate with and represent their retained clients. Prior to Defendants' policy change, Plaintiffs could readily ascertain the location of their detained clients with final orders of removal and could proceed with scheduling legal calls, mailing legal documents, or submitting legal filings based on their clients' location. Those services—which are often time-sensitive—have been and will be delayed, if not totally impeded, because Plaintiffs now have to expend more time and resources with alternate, less reliable, and slower methods to attempt to locate these clients.

64. *Second*, the ODLS Final Order Policy has already or will impact Plaintiffs' ability to take on new cases. Plaintiffs' first step when evaluating a case referral or request for assistance is to determine where the person is being detained and to conduct an intake. Plaintiffs GBLS, FIRRP, and Amica have found it nearly impossible to quickly locate such people and conduct an intake to determine what services they can provide.

65. *Third*, Plaintiffs FIRRP and Amica Center are likely to experience impacts to their grants and other funding streams if the number of clients they serve continues to decrease. The ODLS Final Order Policy has significantly increased the staff time required to locate existing and potential clients, and has also resulted in said clients not being found. Because some current and prospective funders of Plaintiffs FIRRP and Amica Center weigh the number of clients the

organizations serve as part of their grantmaking determinations, Plaintiffs' diminished ability to find and retain clients due to the ODLS Final Order Policy could result in lost funding.

66. Plaintiff GBLS currently represents multiple people with final orders of removal, several of whom are in ICE detention. GBLS currently represents some of these people in the USCIS applications. Continuing to do this work after the ODLS Final Order Policy has required GBLS to spend significant amounts of time and resources calling various detention centers and communicating with the family and friends of the detained person in order to attempt to confirm the person's location. The timeliness of the provision of those services to GBLS's clients is critical, but rather than immediately being able to provide those services, GBLS has been and will continue to be forced to devote staff time to confirming their clients' location, impacting their provision of legal services.

67. Plaintiff Rian currently represents more than 10 people with final orders of removal, almost all of whom they represent in their pending and anticipated applications for relief with USCIS. In light of the ODLS Final Order Policy, Rian has had to prepare for the high likelihood that one of their clients with a final order of removal gets detained, and planning for potential alternative measures they will have to employ to attempt to find that client. Timely intervention for those clients will be critical, as Rian may need to accelerate, postpone, or reschedule appointments and submissions to USCIS and secure habeas counsel for their clients. The timeliness of the provision of those services to Rian's clients is critical, but rather than immediately being able to provide those services, Rian will be forced to devote staff time to confirming their clients' location, impacting their provision of legal services.

68. Plaintiff FIRRP represents, advises, and provides *pro se* support to many detained people across Arizona. FIRRP staff have and will continue to have to divert their time away from

providing legal services towards trying to locate clients and prospective clients that could previously be found through a routine database search. The ODLS Final Order Policy has also caused critical delays in or outright barriers to FIRRP's provision of services to prospective clients, as FIRRP has been unable to schedule services for approximately 15-25 percent of the referrals it has received. FIRRP has also been forced to expend additional time and resources locating clients who have severe mental health disorders, who are even less likely to be able to convey to counsel where they are located.

69. Plaintiff Amica Center represents, advises and provides *pro se* support to many detained people in detention facilities nationwide, providing support to residents of Maryland and the District of Columbia no matter where ICE chooses to detain them. In addition, Amica Center provides *pro se* assistance and Know Your Rights presentations in ICE facilities in the D.C. Metro Area, Maryland, and Virginia.

## <u>CAUSES OF ACTION</u>

### FIRST CAUSE OF ACTION
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action
### (All Plaintiffs against all Defendants)

70. Plaintiffs reallege and incorporate by reference the paragraphs above.

71. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

72. The ODLS Final Order Policy is a final agency action, pursuant to 5 U.S.C. § 704.

73. An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor*

*Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). An agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

74. In addition, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up).

75. The ODLS Final Order Policy is arbitrary and capricious. Defendants have deviated from past practice—suddenly removing a swath of people from an online system that had previously displayed the location of people in ICE custody for 16 years—without an adequate explanation. *See id.*; *Doe v. Noem*, 152 F.4th 272, 289 (1st Cir. 2025).

76. Defendants' only apparent explanation for their new policy—to the extent their statement to the press provides one—is that it is intended to help prioritize these people for deportation in the context of a "historic number of injunctions."[26] The clear implication of such a statement is blatantly unlawful: that it is necessary to prevent people from accessing attorneys and the legal system, so that Defendants can deport more people. Defendants have not articulated a reasoned explanation for their decision to stop showing the location of detained people with final orders of removal on ODLS.

77. On information and belief, Defendants have also failed to consider important aspects of the problem before the agency. Among other things, Defendants apparently gave no consideration to the Policy's effects on attorney-client communications, court proceedings and

[26] *See* Foley, *supra* note 11.

judges' ability to manage their dockets, the impact on detained people with final orders of removal and their families and communities, and the reasons ODLS was created in the first place.

78. On information and belief, Defendants have likewise apparently failed to consider any reasonable alternatives or consider reliance interests, which are significant given ODLS's function over the past 16 years, and which include the interests of detained people and the lawyers who represent them. *See State Farm*, 463 U.S. at 43; *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

79. Defendants' ODLS Final Order Policy directly interferes with Plaintiffs' ability to perform their core function of providing zealous legal representation to their clients.

80. Accordingly, the ODLS Final Order Policy must be vacated and set aside pursuant to 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION**
**Violation of the Administrative Procedure Act**
**Agency Action Contrary to Constitutional Right**
**(All Plaintiffs against all Defendants)**

81. Plaintiffs reallege and incorporate by reference the paragraphs above.

82. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

83. The ODLS Final Order Policy is a final agency action pursuant to 5 U.S.C. § 704.

84. As set out below, the ODLS Final Order Policy is contrary to Plaintiffs' First Amendment rights. *See infra* at ¶¶ 84-93.

**THIRD CAUSE OF ACTION**
**Violation of the First Amendment to the U.S. Constitution**
**(All Plaintiffs against all Defendants)**

85. Plaintiffs reallege and incorporate by reference the paragraphs above.

86. The First Amendment of the United States Constitution prohibits governmental entities from abridging the freedom of speech or association.

87. The First Amendment protects lawyers' ability to advise people of their legal rights and solicit prospective clients. *See NAACP v. Button*, 371 U.S. 415, 428–29 (1963). Plaintiffs have a right to free speech and association under the First Amendment, which includes the right of legal organizations to represent detained people in habeas proceedings, affirmative applications before USCIS, and in challenges to unlawful conditions of confinement, because those activities by Plaintiffs are modes of expression and association. Plaintiffs' First Amendment right to free speech and association extends to communications with current or prospective clients who are in detention.

88. The ODLS Final Order Policy has interfered with Plaintiffs' ability to carry out a core component of their public-interest missions—namely, to protect and defend the rights of detained people through representation in habeas proceedings and challenges and advocacy relating to unlawful conditions of confinement.

89. Courts considering whether detention policies violate First Amendment rights typically examine (1) whether there exists "a valid, rational connection between the [challenged] regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open," (3) "the impact accommodation of the asserted constitutional right will have on guards and other [detained people], and on the allocation of [detention] resources generally," and (4) "the absence of ready alternatives" to the regulation. *Turner v. Safley*, 482 U.S. 78, 89–91 (1987) (cleaned up).[27]

[27] The *Turner* test applies to people incarcerated in prison following a criminal conviction, but immigration detention is "civil, not criminal," *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), and the lawyers whose rights are being asserted herein are not incarcerated at all. People in civil detention "are entitled to more considerate treatment and conditions of confinement" than people with criminal convictions "whose conditions of confinement are designed to punish."

90. No legitimate governmental interest supports the ODLS Final Order Policy. Nor is there any valid, rational connection between this Policy and any governmental interest Defendants may claim.

91. Plaintiffs lack workable alternative means of contacting detained clients whose locations are unknown due to the ODLS Final Order Policy.

92. A Court order requiring Defendants to halt their policy of refusing to list people with final orders of removal on ODLS will have no negative impact on guards and other detained people, or on the allocation of detention resources generally.

93. Ready alternatives exist to the ODLS Final Order Policy. For years, the status quo included people with final orders of removal in ODLS.

94. Plaintiffs have no clear and adequate remedy at law for this violation of their constitutional rights. They have suffered and will imminently suffer irreparable injury caused by the ODLS Final Order Policy.

**FOURTH CAUSE OF ACTION**
**Violation of the Freedom of Information Act, 5 U.S.C. § 552**
**Failure to Proactively Disclose Records**
**(Plaintiffs Greater Boston Legal Services and Rian Immigrant Center against Defendant ICE)**

95. Plaintiffs reallege and incorporate by reference the paragraphs above.

96. The Freedom of Information Act requires that government agencies proactively disclose "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register" and "administrative staff manuals and instructions to staff that affect a member of the public." 5 U.S.C. § 552(a)(2)(B)-(C).

---

*Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). A more lenient standard than *Turner* should therefore apply, but in all events the claims readily satisfy even the more burdensome *Turner* test.

97. The ODLS Final Order Policy is a statement of policy that has been adopted by Defendants DHS and ICE but not published in the Federal Register and is an instruction to staff which affects members of the public. Defendants have broadly adopted the ODLS Final Order Policy, excluding people from ODLS and declining to provide information about them in response to requests by phone.

98. Defendants have prevented the public from becoming aware of the full details and scope of the ODLS Final Order Policy.

99. Defendants have failed to proactively disclose the ODLS Final Order Policy in violation of 5 U.S.C. § 552(a)(2), and no legal basis exists for Defendants' failure to proactively disclose the policy.

100. For these reasons, Defendants must publish the ODLS Final Order Policy and produce the policy for review by Plaintiffs and the public.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

a. Assume jurisdiction of this matter;

b. Declare the ODLS Final Order Policy violates the First Amendment, and is arbitrary and capricious and contrary to constitutional right, pursuant to 5 U.S.C. §§ 706(2)(A) and (B);

c. Stay the ODLS Final Order Policy pursuant to 5 U.S.C. § 705 during the pendency of this case;

d. Vacate the ODLS Final Order Policy pursuant to 5 U.S.C. § 706;

e. Order Defendants to produce and make publicly available the ODLS Final Order Policy;

f. Award costs and fees for this action, including attorneys' fees; and

g. Grant such other relief as the Court deems just and proper.

Dated: October 28, 2026

Respectfully Submitted,

*<u>/s/ Daniel L. McFadden</u>*
Jessie J. Rossman (BBO No. 670685)
Daniel L. McFadden (BBO No. 676612)
Jennifer M. Herrmann (BBO No. 708231)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
dmcfadden@aclum.org
jherrmann@aclum.org

Cassandra Charles* (GA Bar No. 068176)
Kevin Siegel* (NY Bar No. 5800511)
Imani R. Franklin* (DC Bar No. 90006160)
Jia Fu* (NY Bar No. 6294607)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, D.C. 20043
Tel.: (213) 639-3900
Fax: (213) 639-3911

Stephanie M. Alvarez-Jones* (GA Bar No. 237979)‡
Tess Hellgren* (FL Bar No. 1018834) ⸸⸸
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD
(National Immigration Project)
1763 Columbia Road NW
Ste 175 #896645
Washington, DC 20009
T: (202) 470-2082
T: (202) 474-3672
stephanie@nipnlg.org
tess@nipnlg.org

Kyle Virgien* (CA Bar No. 278747)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, 7th Floor
San Francisco, CA 94104
Telephone: (415) 343-0770

Angélica César* (AZ Bar No. 041321)

Annelise Maia Jatoba de Araujo (BBO No. 669913)
ANNELISE ARAUJO LAW LLC
260 Franklin Street, Suite 520
Boston, MA 02110
Telephone: 617-716-6400
annelise@annelisearaujolaw.com

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Telephone: (202) 549-2500

**pro hac vice* application forthcoming

‡ *Not admitted in DC; working remotely from and admitted in Georgia and New Jersey only*
⸸⸸ *not admitted in DC; working remotely from Florida and admitted in Florida and Oregon only*

*Counsel for Plaintiffs*