**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

GREATER BOSTON LEGAL SERVICES, et al.,

*Plaintiffs*,

v.

MARKWAYNE MULLIN, et al.,

*Defendants*.

C.A. No. 26-14869-ADB

**Leave to file granted on October 29, 2026**

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

# TABLE OF CONTENTS

INTRODUCTION 1

BACKGROUND 2

LEGAL STANDARD 7

ARGUMENT 7

I. Plaintiffs are likely to succeed on the merits of their claims that the ODLS Final Order Policy violates the APA. 7

A. All Plaintiffs have organizational standing. 7

B. The ODLS Final Order Policy is a final agency action. 10

C. The ODLS Final Order Policy is arbitrary and capricious. 12

D. Defendants' denial of location information is contrary to law because it violates Plaintiffs' First Amendment rights. 16

II. The ODLS Final Order Policy irreparably harms Plaintiffs. 21

III. The balance of the equities and the public interest strongly favor a stay. 24

CONCLUSION 25

## TABLE OF AUTHORITIES


| Cases | Page(s) |
| --- | --- |
| *ACLU Fund of Michigan v. Livingston County*, 796 F.3d 636 (6th Cir. 2015) | 17 |
| *Advocates for Human Rights v. U.S. Department of Homeland Security*, 820 F. Supp. 3d 789 (D. Minn. 2026) | 18, 24 |
| *Advocates for Human Rights v. U.S. Department of Homeland Security*, 825 F. Supp. 3d 858 (D. Minn. 2026) | 17 |
| *Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) | 21 |
| *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998) | 12 |
| *Association of American Universities v. National Science Foundation*, 788 F. Supp. 3d 106 (D. Mass. 2025) | 16 |
| *Barco Mercado v. Mullin*, No. 25-CV-6568 (LAK), 2026 WL 2874458 (S.D.N.Y. Sept. 24, 2026) | 18 |
| *Barco Mercado v. Noem*, 800 F. Supp. 3d 526 (S.D.N.Y. 2025) *appeal dismissed sub nom. Barco Mercado v. Noem*, No. 25-2922, 2026 WL 1382401 (2d Cir. Mar. 3, 2026). | 24 |
| *Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001) | 18 |
| *Biden v. Texas*, 597 U.S. 785 (2022) | 11 |
| *Burlington North & Santa Fe Railway Co. v. Surface Transportation Board*, 403 F.3d 771 (D.C. Cir. 2005) | 15 |
| *Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) | 18 |
| *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020) | 16, 21 |
| *Developmental Disabilities Advocates Center, Inc. v. Melton*, 689 F.2d 281 (1st Cir. 1982) | 17 |

| **Cases** | **Page(s)** |
|---|---|
| *Doe v. Noem*,<br>152 F.4th 272 (1st Cir. 2025) | 13 |
| *Doe v. Trump*,<br>157 F.4th 36 (1st Cir. 2025) | 7, 8 |
| *Elrod v. Burns*,<br>427 U.S. 347 (1976) | 21 |
| *Encino Motorcars, LLC v. Navarro*,<br>579 U.S. 211 (2016) | 15 |
| *Espinoza Escalona v. Noem*,<br>No. 25-cv-00604, ECF No. 14-2 (D.D.C. Mar. 10, 2025) | 18 |
| *FDA v. Alliance for Hippocratic Medicine*,<br>602 U.S. 367 (2024) | 8 |
| *FDA v. Wages & White Lion Investments, L.L.C.*,<br>604 U.S. 542 (2025) | 13 |
| *Gomez Ruiz v. U.S. Immigration & Customs Enforcement*,<br>834 F. Supp. 3d 835 (N.D. Cal. 2026) | 24 |
| *Greater Boston Legal Services v. D.H.S.*,<br>No. 25-1799, 2026 WL 3257620 (1st Cir. Oct. 29, 2026) | 8, 9, 10 |
| *H.C.R. v. Mullin*,<br>825 F. Supp. 3d 1267 (M.D. Fla. 2026) | 23 |
| *H.C.R. v. Noem*,<br>25-cv-00747, ECF No. 166-1 (M.D. Fla. Nov. 14, 2025) | 18 |
| *Havens Realty Corp. v. Coleman*,<br>455 U.S. 363 (1982) | 8, 10 |
| *Immigrants Defenders Law Center v. Mayorkas*,<br>No. CV 20-9893, 2023 WL 3149243 (C.D. Cal. Mar. 15, 2023) | 17 |
| *In re Primus*,<br>436 U.S. 412 (1978) | 17 |

**Cases** **Page(s)**

*Jean v. Nelson*,
711 F.2d 1455 (11th Cir. 1983) 17

*Jimenez v. Cronen*,
317 F. Supp. 3d 626 (D. Mass. 2018) 22

*Kong v. United States*,
62 F.4th 608 (1st Cir. 2023) 21

*Kuperman v. Wrenn*,
645 F.3d 69 (1st Cir. 2011) 18

*League of Women Voters of Massachusetts v. Trump*,
190 F.4th 27 (1st Cir. 2026) 8, 10

*Legal Services Corp. v. Velazquez*,
531 U.S. 533 (2001) 16

*Lozada v. INS*,
857 F.2d 10 (1st Cir. 1988) 21

*Make the Road N.Y. v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) 25

*Massachusetts v. National Institute of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025) 7

*Michigan v. EPA*,
576 U.S. 743 (2015) 15

*Moreno Gonzalez v. Noem*,
No. 25 C 13323, 2025 WL 3170784 (N.D. Ill. Nov. 5, 2025) 18

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automotive Insurance Co.*,
463 U.S. 29 (1983) 14

*NAACP v. Button*,
371 U.S. 415 (1963) 16

*New England Synod v. Department of Homeland Security*,
824 F. Supp. 3d 118 (D. Mass. 2026) 7

*Nken v. Holder*,
556 U.S. 418 (2009) 24

| **Cases** | **Page(s)** |
|---|---|
| *Ohio v. Environmental Protection Agency*, 603 U.S. 279 (2024) | 12 |
| *President's Alliance on Higher Education & Immigration v. Noem*, 824 F. Supp. 3d 168 (D. Mass. 2026) | 11 |
| *Reyes v. U.S. Immigration & Custom Enforcement*, No. 2:25-CV-01159, 2025 WL 3724847 (D. Utah Dec. 24, 2025) | 24 |
| *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996). | 21 |
| *Sampiao v. Hyde*, 799 F. Supp. 3d 14 (D. Mass. 2025) | 22 |
| *Schiff v. U.S. Office of Personnel Management*, 784 F. Supp. 3d 380 (D. Mass. 2025) | 21 |
| *Sendra Gonzalez v. Miami ICE Field Office Director*, No. 1:26-cv-23385, 2026 WL 3181907 (S.D. Fla. Oct. 6, 2026) | 14, 15, 18 |
| *Somerville Public Schools v. McMahon*, 139 F.4th 63 (1st Cir. 2025) | 25 |
| *Trump v. J.G.G.*, 604 U.S. 670 (2025) | 12 |
| *Turner v. Safley*, 482 U.S. 78 (1987) | 17 |
| *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016) | 11, 12 |
| *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850 (C.D. Cal. 2025) | 22 |
| *Whitman v. American Trucking Associations*, 531 U.S. 457 (2001) | 11 |
| *Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*, 186 F.4th 25 (1st Cir. 2026) | 8 |
| *Youngberg v. Romeo*, 457 U.S. 307 (1982) | 18 |

**Cases** **Page(s)**

*Zadvydas v. Davis*,
533 U.S. 678 (2001) 18

**Statutes**

5 U.S.C. § 704 10

5 U.S.C. § 705 2, 7

5 U.S.C. § 706(2)(A) 12

**Regulatory Authorities**

8 C.F.R. § 1241.1 4, 15

75 Fed. Reg. 23274 *passim*

**Other Authorities**

Department of Homeland Sec. U.S. Immigration & Customs Enforcement-011 Immigration & Enforcement Operational Records System of Records 2

Deportation Data Project, *Average daily number in ICE detention by month, filtered by final order* 4

Deportation Data Project, Number of Book-Ins to ICE detention by month, filtered by final order before book-in 5

Executive Office of Immigration Review, *Adjudication Statistics: In Absentia Removal Orders* (July 24, 2026) 5

Guila McDonnell Nieto del Rio, "'It was complete disarray': Chaos, disruption at Chelmsford immigration court", Boston Globe (September 18, 2026) 5

*Holiday on Ice: The U.S. Department of Homeland Security's New Immigration Detention Standards Before the Subcomm. on Immigration Policy and Enforcement* 112th Cong. 20-30 (2012) 20

Human Rights First, ICE Flight Monitor, *September 2026 Report*, 8–9 (Oct. 19, 2026) 5

ICE, *ICE Detained Parents Directive* (Aug. 11, 2025) 19

*ICE hasn't paid for detainee medical care since October. Advocates call it a 'death policy,'* San Francisco Chronicle (Sept. 2, 2026) 22

ICE, *Legal Access in Detention at a Glance* (Aug. 2021) 19

**<u>Other Authorities</u>** **<u>Page(s)</u>**

Maria Sacchetti & Liam Bowman*, Immigrants with final deportation orders disappear from ICE detainee locator, Wash. Post* (Sept. 21, 2026), 3, 12, 13

Privacy Act of 1974 2

Ryan J. Foley, *ICE hides location of thousands of detainees with final removal orders*, Associated Press (Sept. 21, 2026) 3, 13, 16

U.S. Dept. Homeland Sec., *Privacy Impact Assessment for the Online Detainee Locator System*, DHS Ref. No. DHS/ICE/PIA-019, 16 July 202 3

U.S. Immigration & Customs Enforcement, *About the Detainee Locator / FAQs* 3

U.S. Immigration & Customs Enforcement, *Contact ICE About Immigration Enforcement Concerns* 6

U.S. Immigration & Customs Enforcement, *ERO eFile* 6

U.S. Immigration & Customs Enforcement, *List of Participating Facilities* 7

## INTRODUCTION

Last month, Defendants disappeared thousands of people in civil immigration detention from the primary tool that allowed their lawyers, families, and communities to locate them within the vast network of detention facilities run by the Department of Homeland Security ("DHS"). For 16 years, DHS has operated a publicly available Online Detainee Locator System ("ODLS"), which provides an efficient and frequently indispensable means to learn if a client or loved one has been detained, to identify their current location of detention, to track their transfers as they move through DHS's nationwide detention network, and to make time-sensitive, deeply consequential decisions based on that information. Yet, on or about September 15, 2026, without any notice or public disclosure, DHS inexplicably implemented a policy by which it abruptly stopped disclosing the location of detained people with administratively final orders of removal, either on ODLS or in response to direct inquiries (the "ODLS Final Order Policy" or "Policy"). Overnight, thousands of people vanished. Every day, DHS makes more arrests, and more people disappear into its sprawling civil confinement network. This policy change was arbitrary, capricious, unlawful, and is deeply harmful to detainees, their families, their counsel, the orderly function of the legal system, and the foundational principles of our democracy and the rule of law.

Plaintiffs are four legal services organizations dedicated to representing people in need of immigration assistance—including people with final orders of removal who are or could be detained—in agency and judicial proceedings. Precisely because the use of ODLS is such an integral component of their day-to-day activities, Plaintiffs immediately began experiencing the effects of the ODLS Final Order Policy. The Policy directly affected and perceptibly interfered with their core business activities of providing immigration-related legal services, as it became impossible to file motions for existing clients whose location was a mystery, and they were

incapable of engaging potential clients they could not locate. Plaintiffs lost the ability to timely determine the judicial district in which to file a habeas corpus petition on behalf of many recently detained clients, and similarly became unable to offer representation to detained people who may have been eligible for their services following a referral from a loved one who was equally unable to determine where U.S. Immigration and Customs Enforcement ("ICE") had disappeared the potential client.

The ODLS Final Order Policy violates the Administrative Procedure Act ("APA") and Plaintiffs' First Amendment rights. First, the Policy is arbitrary and capricious in violation of the APA. Second, the Policy is an impediment between attorneys and their detained clients that unjustifiably interferes with Plaintiffs' First Amendment rights to free speech and association.

Plaintiffs move to stay the ODLS Final Order Policy pursuant to 5 U.S.C. § 705. Plaintiffs are likely to succeed on the merits. They are currently experiencing irreparable harm as Defendants needlessly obstruct their communication with clients and potential clients in ICE detention, interfering with their core missions of providing zealous legal representation. The balance of the equities and public interest weigh heavily in favor of staying the Policy and restoring ODLS as a vital link between detained people and their attorneys during the pendency of this matter.

## BACKGROUND

In June 2010, the federal government established ODLS as a web-based system owned and operated by ICE. *See* Privacy Act of 1974; Dep't of Homeland Sec. U.S. Immigr. & Customs Enf't-011 Immigr. & Enf't Operational Records System of Records, 75 Fed. Reg. 23274–79 (May 3, 2010). When it was first established, ICE stated that it had

> developed ODLS as a service to the public, especially family members and legal representatives, to help locate individuals arrested for administrative immigration violations and who are in or have recently left ICE custody . . . . Currently, members of the public

> must contact a [Detention and Removal Operations] field office by phone to determine the location of a detainee. With the deployment of this automated system, the public will be able to locate detainees more quickly and efficiently through an online query.

*Id.* ODLS works by extracting real-time data from the ICE Enforcement Integrated Database ("EID"), which contains information about people in ICE custody.[1] When an individual's data is queried in ODLS, it is automatically run against data in EID.[2]

On or about September 15, 2026, Defendants made an unprecedented and intentional policy change to limit the public information provided through ODLS.[3] It is believed that Defendants issued a directive, the ODLS Final Order Policy, informing staff that custody information for any detained people with final removal orders, except those at four exempted facilities, would no longer appear in the public ODLS.[4] The directive reportedly includes explicit instructions that if officers are asked by attorneys or family members about the location of a detained person with a final order, they should refuse to provide the location of that person.[5] The ODLS Final Order Policy therefore does not simply revert DHS's policy back to what it was pre-2010, when information as to a person's detention could only be determined via phone call to ICE,

---

[1] Pursuant to ICE policy, all information pertaining to the release, removal, or transfer of detained people must be entered into the Enforcement Integrated Database within eight hours of the action. *See* U.S. Immigr. & Customs Enf't, *About the Detainee Locator / FAQs*, https://locator.ice.gov/odls/#/about?includeCBP=true&moreInfoNoResults=https:%2F%2Fwww.cbp.gov%2Fborder-security%2Falong-us-borders%2Fmissing-migrant-program [https://perma.cc/HHE9-E8J3] (last visited Nov. 4, 2026) (explaining that "ODLS information may be up to eight hours old," and "ODLS is updated from other ICE systems in near real time").

[2] *See* U.S. Dept. Homeland Sec., *Privacy Impact Assessment for the Online Detainee Locator System*, DHS Ref. No. DHS/ICE/PIA-019, 16 July 2025, at 2 https://www.dhs.gov/sites/default/files/2025-07/25_0716_priv_pia-ice-019-odls.pdf (last visited Nov. 4, 2026) [hereinafter, "*Privacy Assessment*"].

[3] *See* Ryan J. Foley, *ICE hides location of thousands of detainees with final removal orders*, Associated Press (Sept. 21, 2026), https://apnews.com/article/ice-detainee-locator-disappear-removal-orders-c3329a70bce424879bc5880b286c019c.

[4] *See id.*

[5] *See* Maria Sacchetti & Liam Bowman, *Immigrants with final deportation orders disappear from ICE detainee locator*, Wash. Post (Sept. 21, 2026), https://www.washingtonpost.com/immigration/2026/09/21/immigrants-with-final-deportation-orders-disappear-ice-detainee-locator/ (reporting that the ODLS Final Order Policy "also bars immigration officers from sharing information about a detainee's location with their attorneys or relatives by phone").

but instead adopts a policy that is even more secretive than the system that existed before ODLS was created.

Outside of the four exempted facilities, the ODLS Final Order Policy reportedly applies to anyone in ICE custody who has received an administratively final removal order.[6] But Defendants have failed to publish or otherwise make publicly available the language of the ODLS Final Order Policy, creating uncertainty in the community about the specific details and scope of the Policy.

This Policy will necessarily impact both people already in ICE custody and people who will be detained in the future. Those numbers are staggering: in July 2026, there were on average 66,904 people in ICE detention each day, and an average of 21,700 of those people had final orders of removal.[7] Based on these most recent publicly available numbers, the ODLS Final Order Policy is hiding the location of approximately 32 percent of people in ICE custody on any given day.

Not only has ICE concealed the location of tens of thousands of people in its custody, but it will continue to do so until the ODLS Final Order Policy is vacated, as it arrests more and more

---

[6] A removal order issued by an immigration judge becomes administratively final when the person (i) waives appeal of the order or otherwise fails to appeal it within 30 days, or (ii) appeals the order to the Board of Immigration Appeals ("BIA") and the BIA denies the appeal. *See* 8 C.F.R. § 1241.1.

[7] Deportation Data Project, *Average daily number in ICE detention by month*, https://app.deportationdata.org/?agency=ice&dataset=detention-stays&tab=chart&s=eJxVyEsKgCAUQNG93LGBFRS8zTyExIT8UCJEtPfGneF56MhsuJprCK4H3Vw8bgwtJo-QSm47huALgmou2atiCGf9R6oIk52Wwa6DHXk_ThgbrA [https://perma.cc/9FYM-5V7W?type=image] (last accessed Nov. 4, 2026); Deportation Data Project, *Average daily number in ICE detention by month, filtered by final order*, https://app.deportationdata.org/?agency=ice&dataset=detention-stays&tab=chart&s=eJxVysFqAjEUQNF_uesnTC208HaFdtuNKxEJwXmOkUwSMnFgkPl3wYXg9nDuzOinMDXfUPw8uN6HuCC0MBrKmFO7IAyWUZxLOZlzCEMt7zAWlG23_dp035vuA-EcYrM6oXfaUgxlqPlWEE45XVF-_n8RTpcQ-2oJPbxivUV7vohyDslHl2tv1S02uZQRckEJCWH2EWX_t2M9rusD3PFBpQ (last accessed Nov. 4, 2026).

people each day.[8] ICE's frequent transfer flights mean that people are often transferred between detention centers suddenly, making their location all that much harder to determine.[9]

This harm is compounded by the government's legally-suspect tactics to increase the number of removal orders, such as by providing people with insufficient or defective notice for "mega master" hearings.[10] The Executive Office of Immigration Review's own data indicates that the number of *in absentia* removal orders (which are administratively final orders) has skyrocketed, with an average of 31,319 new such orders issued each month in 2026.[11]

Potential alternatives to ODLS are simply not tenable. Calling ICE Field Offices is unlikely to be meaningful because the ODLS Final Order Policy reportedly includes a directive to ICE officers not to disclose the location of detained people with final orders.[12] What is more, ICE created ODLS precisely to avoid having ICE officers' time absorbed by answering calls from family members and attorneys looking for their clients. 75 Fed. Reg. 23274–23279 (May 3, 2010). Now, calls to numerous ICE Field Offices to try to find a person's location lead to long wait times on hold, sudden hang-ups, and a general lack of information.[13] *See* Decl. of Rosalyn Leban ("Leban Decl.") ¶¶ 12–14 (practitioner called and emailed ICE field office multiple times to no avail); Decl. of Madhavi Narayanan ("Narayanan Decl.") ¶¶ 8, 12–13 (attorney could not get staff at

---

[8] Deportation Data Project, Number of Book-Ins to ICE detention by month, filtered by final order before book-in, https://app.deportationdata.org/?agency=ice&dataset=detention-stays&tab=chart&s=eJxVzsFKw0AQgOF3-c9biBUU5iZ49gVEljadpKubmWWyEaTk3YUeBK8_3-G_8Y08JtZ-6gijb9bz2f2r2Eqil0URFrd-JTGrI-RsbpoziTna_7A0hONwfDoMz4fhgcRUatdYkRv9pynCHL41EqPbJ8LL2yuJ8VrqJdSQ9z8YW9W7qwhTsVPNHheNfNbJQ--fuRgJbwhlzT02Zf_Y91-2A0Wa [https://perma.cc/H9JH-LGSS?type=image] (last accessed Nov. 4, 2026) (finding that Defendant ICE placed 13,788 people with final orders in detention in July 2026).

[9] Human Rights First, ICE Flight Monitor, *September 2026 Report*, 8–9 (Oct. 19, 2026), https://cdn.sanity.io/files/1e7vpawz/production/099567a36056b4d604d4bbbea398a83c1e1e8377.pdf [https://perma.cc/HA9H-NN42].

[10] *See* Guila McDonnell Nieto del Rio, "'It was complete disarray': Chaos, disruption at Chelmsford immigration court", Boston Globe (September 18, 2026), https://www.bostonglobe.com/2026/09/19/metro/immigration-court-chaos/.

[11] Executive Office of Immigration Review, *Adjudication Statistics: In Absentia Removal Orders* (July 24, 2026), https://www.justice.gov/eoir/media/1344881/dl?inline.

[12] *See* Saccheti & Bowman, *supra* note 5.

[13] *Id.*

multiple detention facilities to pick up the phone or provide any information; left multiple voicemails to ICE but never received a response); Decl. of Magdelena Metelska ("Metelska Decl.") ¶¶ 6–7 (attorney unable to reach ICE officers or obtain any information on client). Emails to ICE offices generally have the same result. *See* Decl. of Helen Boyer ("Boyer Decl.") ¶ 11.

Calling ICE's Detention, Removals, and Information Line ("DRIL") fares no better. The hotline is available only "Monday through Friday (excluding holidays) from **8 a.m. to 8 p.m.** (Eastern Time)" (bold in original).[14] This limited window is not especially useful as people are often transferred late at night or over the weekend. It is even less useful for people detained in other time zones. In addition, it appears the tool that DRIL hotline operators use to locate a detained individual *is ODLS itself*. As a result, when a detained person is excluded from ODLS, DRIL operators apparently will not be able to promptly find them or share their location either. *See* Decl. of Aimee Mayer-Salins ("Mayer-Salins Decl.") ¶ 29.

Attorneys have also attempted to use the Enforcement and Removal Operations ("ERO") eFile platform—typically used to schedule legal calls—as a potential workaround to determine the location of detained people in light of the ODLS Final Order Policy, even though this is not the designed use of the eFile platform.[15] *See* Mayer-Salins Decl. ¶ 20; Decl. of Laura St. John ("St. John Decl.") ¶ 30; Decl. of Lilah Thompson ("Thompson Decl.") ¶¶ 7, 14; Leban Decl. ¶¶ 5–6. However, this workaround only works if the individual is at one of the participating facilities, which account for only a small percentage of the detention facilities where ICE detains people. *See* Decl. of Alicia de la O ("de la O Decl.") ¶ 20 ("only 45 facilities use the ICE ERO eFile online system out of over 200 possible ICE detention facilities nationwide"); Decl. of Amy Romero

---

[14] U.S. Immigr. & Customs Enf't, *Contact ICE About Immigration Enforcement Concerns*, https://www.ice.gov/enforcementconcerns [https://perma.cc/E29Y-S8HC] (last updated July 1, 2026).

[15] *See* U.S. Immigr. & Customs Enf't, *ERO eFile*, https://eroefile.ice.gov/eroefile [https://perma.cc/R8N3-7VM4] (last accessed Nov. 4, 2026).

("Romero Decl.") ¶ 18 (noting that Wyatt Detention Center in Rhode Island does not use ERO eFile); *see also* U.S. Immigr. & Customs Enf't, *List of Participating Facilities*, https://www.ice.gov/eroefile/dfas (last visited Nov. 4, 2026) (listing 46 participating facilities).

## LEGAL STANDARD

Section 705 of the APA authorizes a court reviewing an agency action to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" when "necessary to prevent irreparable injury." 5 U.S.C. § 705. The factors that govern preliminary injunctions also apply to Section 705 stays. *New England Synod v. Dep't of Homeland Sec.*, 824 F. Supp. 3d 118, 139 (D. Mass. 2026). A court may issue a stay if the movant has established that they are "likely to succeed on the merits"; "likely to suffer irreparable harm" absent a stay; and the balance of the equities and the public interest favor a stay. *Doe v. Trump*, 157 F.4th 36, 46 (1st Cir. 2025) (citation modified). When the government is the opposing party, the equities and public interest factors merge. *Massachusetts v. Nat'l Inst. of Health*, 770 F. Supp. 3d 277, 295 (D. Mass. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

The Court should stay the ODLS Final Order Policy during the pendency of this litigation to avoid continued, irreparable harm to Plaintiffs and the thousands of people with final orders of removal in ICE custody. As discussed below, Plaintiffs meet all the requirements for a 705 stay.

### I. Plaintiffs are likely to succeed on the merits of their claims that the ODLS Final Order Policy violates the APA.

#### *A. All Plaintiffs have organizational standing.*

There are three well-recognized elements to demonstrate standing: "(1) an injury-in-fact, (2) that is 'fairly traceable' to defendant's challenged conduct, and (3) 'that is likely to be redressed

by a favorable judicial decision.'" *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 36 (1st Cir. 2026) (citations omitted). When seeking preliminary relief, "the plaintiffs need only make a clear showing that they are *likely* to succeed in establishing Article III standing." *Doe v. Trump*, 157 F.4th at 47 (emphasis in original). All Plaintiffs meet this standard.

Organizations show an injury-in-fact when a challenged action "perceptibly impair[s]" their "ability to provide" direct services to people. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also League of Women Voters of Mass. v. Trump*, 190 F.4th 27, 39 (1st Cir. 2026) (agency action "interfer[ing] with the provision of [an organization's] core services" is sufficient harm to establish organizational standing); *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (confirming that injury is established when the defendant's "actions directly affected and interfered with" an organization's "core business activities"); *Greater Boston Legal Servs. v. D.H.S.*, No. 25-1799, 2026 WL 3257620, at *5 (1st Cir. Oct. 29, 2026) (same).

Even more so than the "*false information*" that "caused a direct injury" to the *Havens* plaintiffs' ability to provide housing counseling to prospective clients, the Policy's *excising of any information* about the location of detained people with final orders of removal "directly affect[s] and interfere[s] with [Plaintiffs'] core business activities" of providing legal counseling and services to clients and prospective clients. *Greater Boston Legal Servs.*, 2026 WL 3257620, at *5 (emphasis added). *See* Decl. of Maggie Morgan ("Morgan Decl.") ¶¶ 7, 12 (GBLS' core work includes representing people with final orders of removal, including detainees); Decl. of Jacqueline M. Kelley ("Kelley Decl.") ¶¶ 4-7 (Rian's mission is to provide immigration assistance, including to people with final orders of removal); St. John Decl. ¶¶ 8, 10 ("FIRRP's vision is to ensure that all immigrants facing removal have access to counsel" and FIRRP provides immigration legal, education, and social services to advance their mission); Mayer-Salins Decl. ¶¶ 5, 7, 9, 12 (Amica

Center's mission includes representation, education, advocacy, and other immigration related support, including to people with final orders of removal and detainees). The Policy makes it impossible to swiftly locate detained individuals with final orders in Defendants' sprawling immigration detention system, rendering Plaintiffs incapable of providing legal services to certain existing and prospective clients. In this way, Defendants directly obstruct Plaintiffs' ability to fulfill their organizational missions. *See Greater Boston Legal Servs.*, 2026 WL 3257620, at *6 (affirming standing where "it would be impossible" for the organization to provide services); *see also* Morgan Decl. ¶ 16 (Policy makes it "entirely impossible to reach the people in need of services our mission would have us provide"); Kelley Decl. ¶ 12 ("[T]he government has cut off access to information that is necessary to Rian's ability to fulfill its core business activities of providing immigration assistance to people in Massachusetts"); St. John Decl. ¶¶ 40-41, 49 ("[M]any individuals whom FIRRP's core services are designed to serve cannot access our legal orientations in a timely manner, if at all")*;* Mayer-Salins Decl. ¶¶ 17, 32 (inability to know location makes it "impossible" for Amica to offer representation, including for those "who might otherwise fit our case acceptance criteria").

In response to the ODLS Final Order Policy, Plaintiffs must now spend significant time and resources attempting to locate clients by alternative means, efforts that at worst may prove futile and at best will nonetheless result in critical delay. Either outcome substantively interferes with their ability to secure the immigration relief—which is often time sensitive—that they must work to obtain under their missions. *See* Morgan Decl. ¶¶ 16–20; Kelley Decl. ¶¶ 5–8, 12; St. John Decl. ¶¶ 10–17; 44–48; Mayer-Salins Decl. ¶¶ 5, 35. This inability to locate current and potential clients not only adds new steps or costs to representing people with final removal orders: it cuts Plaintiffs off from current clients to whom they have ongoing obligations, and from potential

clients whom they would otherwise serve, seriously impeding their ability to perform their core business activities, which include pursuing immigration and other legal relief on behalf of their clients and advocating for their medical needs and well-being. *See, e.g.*, Morgan Decl. ¶ 10 ("[P]rompt action may be required to advocate for people with severe medical conditions who are arrested and may not have access to adequate medical care while in detention."); St. John Decl. ¶ 33 (describing frequent need to obtain "time-sensitive signatures" from detained individuals); Mayer-Salins Decl. ¶ 16 (affirmative litigation obstructed by the Policy because "it may end up proving impossible to contact potential plaintiffs or witnesses"). Notably, without the ability to swiftly locate detained people with final removal orders, Plaintiffs cannot engage in the rapid legal interventions required to prevent unlawful third-country removals. *See, e.g.*, Morgan Decl. ¶¶ 19.

By withholding location information regarding detained clients and prospective clients, the ODLS Final Order Policy substantively interferes with Plaintiffs' time-sensitive core business activities, and in many cases, makes such work entirely "impossible." *See Greater Boston Legal Servs*., 2026 WL 3257620, at *6. This constitutes a cognizable injury in fact. *See Havens*, 455 U.S. at 379; *League of Women Voters of Mass.*, 190 F.4th at 38–39. What is more, this injury is both traceable to the Policy—prior to its implementation, Plaintiffs were able to perform their core business activities by locating their clients and prospective clients through ODLS—and redressable by this Court's implementation of a stay. Plaintiffs have therefore shown that they are likely to succeed in demonstrating standing.

### *B. The ODLS Final Order Policy is a final agency action.*

The APA permits review of agency actions that are "final." 5 U.S.C. § 704. An agency action is "final" if (1) it "mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) it is "one by which rights or

obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

First, the ODLS Final Order Policy is a consummation of the agency's decisionmaking process because it determined that DHS will no longer disclose the location of detained people with final orders of removal. Starting on September 15, 2026, DHS ordered that aside from four exempted locations, people with final orders of removal in DHS custody were no longer going to appear in the ODLS and further directed officers not to share "information about a detainee's location with their attorneys or relatives by phone."[16] There is nothing "tentative or interlocutory" about this policy. *Hawkes*, 578 U.S. at 597. It was effective immediately and represents DHS's "last word on the matter in question." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478–79 (2001) (cleaned up). In fact, detained people with final orders of removal who disappeared from ODLS when the Policy took effect have not been restored to the ODLS since. *See* Mayer-Salins Decl. ¶ 18; St. John Decl. ¶¶ 32, 40; Romero Decl. ¶¶ 21–22; Decl. of Reema Ghabra ("Ghabra Decl.") ¶ 9; Naranayan Decl. ¶¶ 7, 12; Thompson Decl. ¶¶ 7–9; Metelska Decl. ¶¶ 8, 12–13; Leban Decl. ¶¶ 5, 10–11; de la O Decl. ¶ 11.

Second, the ODLS Final Order Policy determines rights and obligations and already has legal consequences. The Policy allegedly directs and binds agency staff to not disclose the location of people with final orders in DHS custody. *See Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (finding that an agency's action was "final" because it "bound DHS staff by forbidding them to

---

[16] Sachetti & Bowman, *supra* note 5. Although a copy of the ODLS Final Order Policy is not yet public, the Court "may plausibly infer the existence of such a policy" based on the allegations in the Complaint that as of September 15, 2026, people with final orders of removal in DHS custody were no longer appearing on ODLS, the sworn declarations appended hereto, and the public reporting on the issue. *President's All. on Higher Educ. & Immigr. v. Noem*, 824 F. Supp. 3d 168, 195 (D. Mass. 2026).

continue the program in any way from that moment on"). Before September 15, 2026, attorneys and community members could find detained people with final orders in DHS custody by entering specific information into ODLS or by speaking to a DHS official. Since implementation of the ODLS Final Order Policy, DHS staff have been obligated to not disclose that information.[17] The ODLS Final Order Policy also has "legal consequences" for detained people with final orders. *Hawkes*, 578 U.S. at 597. Now that ODLS will not show their location, and DHS officials are not permitted to disclose location information, DHS has effectively disappeared detained people with final orders. Retained or prospective legal counsel face serious obstacles locating them and providing effective legal counsel or representation, such as determining the proper venue for a petition for habeas corpus. *See Trump v. J.G.G.*, 604 U.S. 670, 672 (2025); Romero Decl. ¶¶ 7–8, 16; Narayanan Decl. ¶¶ 19–20. Moreover, counsel face serious obstacles consulting with detained people with final orders of removal ahead of any challenges to the conditions or legality of their confinement. *See* St. John Decl. ¶¶ 47–50; Mayer-Salins Decl. ¶ 15; Romero Decl. ¶¶ 7–9.

### ***C. The ODLS Final Order Policy is arbitrary and capricious.***

Plaintiffs are likely to succeed in demonstrating that the ODLS Final Order Policy violates the APA because it is "arbitrary and capricious" in multiple respects, and, ultimately, is not the product of reasoned decisionmaking. 5 U.S.C. § 706(2)(A); *see, e.g.*, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.").

Agency action is "arbitrary or capricious if it is not reasonable and reasonably explained." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project,*

---

[17] *See* Sacchetti & Bowman, *supra* note 5.

592 U.S. 414, 423 (2021)) (quotation marks omitted). In addition, "[a]gencies are free to change their existing policies *as long as* they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up and emphasis added) (describing the change-in-position doctrine). To justify a change-in-position, "the agency must show that there are good reasons for the new policy." *Doe v. Noem*, 152 F.4th 272, 289 (1st Cir. 2025) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see California v. U.S. Dep't of Educ.*, C.A. No. 25-10548-AK, 2026 WL 2754968, at *17–25 (D. Mass. Sept. 17, 2025) (vacating arbitrary and capricious agency action for lack of reasonable explanation, "failure to acknowledge and adequately explain the change in position," and failure to consider reliance interests).

Defendants failed to meet that standard here. Defendants' sudden deviation from past practice by removing tens of thousands of people whose locations were previously disclosed on ODLS for 16 years constitutes an act inconsistent with DHS's earlier position.[18] *Wages & White Lion*, 604 U.S. at 569–70. And while the agency has apparently displayed awareness of this change in position—by "briefing" officials on the "change"[19]—there have been no apparent "good reasons for the new policy." *Id.* ODLS is an automated system that draws data from DHS's regularly maintained databases. There is no legitimate reason to suddenly restrict its scope to exclude people who were included for nearly two decades. While by no means clear, the only possible explanation Defendants provided for their new policy appeared to connect it to the prioritization of deporting people with final orders of removal in the face of a historic number of injunctions.[20] The implication of such reasoning is blatantly unlawful: that the Policy exists for the improper purpose

[18] *Compare* Foley, *supra* note 3, *with* 75 Fed. Reg. 23274–79 (May 3, 2010).
[19] Sacchetti & Bowman, *supra* note 5.
[20] Foley, *supra* note 3.

of obstructing practical access to lawyers and by extension to the judicial system, so as to prevent the courts from enforcing the law. Indeed, the ODLS Final Order Policy "does not appear to serve any real purpose other than to obfuscate [courts'] ability to ascertain [their] jurisdiction—while also impeding the ability of family members, legal representatives, and members of the public to locate those detained by ICE." *Sendra Gonzalez v. Miami ICE Field Office Director*, No. 1:26-cv-23385, 2026 WL 3181907, at *2 (S.D. Fla. Oct. 6, 2026). Defendants have failed to articulate a reasoned explanation for their decision to stop showing the location of detained people with final orders of removal on ODLS, which does not constitute a lawful change in agency position. *Id.*

In addition to failing to articulate a reasoned explanation for their Policy, Defendants similarly failed to consider important aspects of the problems created by the Policy. An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Therefore, when an agency adopts a new policy, it must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations,* 556 U.S. at 516. Defendants failed to meet that standard here. In deciding to remove the detention location of people with final orders of removal from ODLS, DHS ignored multiple "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, including its impact on attorney-client contact and the disparate treatment of people with final orders of removal.

Defendants do not appear to demonstrate any awareness of the negative impact of the Policy's impediments to attorney-client contact, nor do they appear to offer any meaningful alternative to ensure that attorneys and family members are otherwise able to locate a person with a final removal order in DHS custody. Rather, the Policy appears to entirely ignore the costs of

DHS's decision. *Michigan v. EPA*, 576 U.S. 743, 751 (2015) (holding that failing to consider costs was unreasonable). Moreover, it appears Defendants failed to consider the disparity between concealing the location of people with final orders and apparently making no change to the disclosure of the location of people without a removal order. There appears to be no explanation or justification for "treating similarly situated parties differently." *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005). While people with final orders may no longer be in active removal proceedings, *see* 8 C.F.R. § 1241.1, contact with an attorney is necessary to seek other forms of immigration relief, file federal habeas petitions, bring challenges to conditions of confinement, and secure representation in any federal or state criminal proceedings. *See supra* Section I.A; St. John Decl. ¶¶ 20–25; Mayer-Salins Decl. ¶¶ 15–16; Metelska Decl. ¶¶ 20–21; Thompson Decl. ¶¶ 17–18, 22; Leban Decl. ¶¶ 17–18; Narayanan Decl. ¶¶ 18–20. The Policy appears to have no explanation for why people with final orders of removal are treated differently. This "unexplained inconsistency" renders the policy "arbitrary and capricious." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation modified).

It also appears Defendants have failed to consider any reasonable alternatives to stripping people with final orders of removal out of the locator. And it is abundantly clear that there is presently no alternative system available to timely locate people with final orders. *See supra* Background. The ODLS Final Order Policy suddenly disappeared thousands of people, leaving attorneys, families, communities, and some judges without a reliable way to locate them. *See* de la O Decl. ¶ 20; Boyer Decl. ¶¶ 14, 18–19; Ghabra Decl. ¶¶ 7–9; *Sendra Gonzalez*, 2026 WL 3181907, at *2.

Finally, an agency must also "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of*

*the Univ. of Cal.*, 591 U.S. 1, 30 (2020). When there are reliance interests, the agency should "determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33. Here, the existence of ODLS for the prior 16 years created reliance interests. There is no indication Defendants weighed those interests against competing concerns as they were required to do. *Id.* (explaining that agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns"); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 137 (D. Mass. 2025). Both lawyers and family members had an expectation that they were going to be able to find someone in DHS custody by searching ODLS. Ghabra Decl. ¶¶ 7–9; Leban Decl. ¶¶ 9–10.

In sum, the ODLS Final Order Policy does not address a multitude of issues that Defendants should have considered before implementation. Even the Defendants' own opaque statements appear to suggest that the only goal was to obstruct access to legal counsel to make it easier to violate people's rights.[21] DHS's sudden policy shift is arbitrary and capricious.

### ***D. Defendants' denial of location information is contrary to law because it violates Plaintiffs' First Amendment rights.***

The First Amendment protects lawyers' ability to advise people of their legal rights and to solicit prospective clients. *See NAACP v. Button*, 371 U.S. 415, 428–29 (1963)*; see also Legal Services Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001). And for legal services organizations such as Plaintiffs, "litigation is not a technique of resolving private differences; it is a form of political expression and political association." *In re Primus*, 436 U.S. 412, 428 (1978) (citation modified); *see also Developmental Disabilities Advoc. Ctr., Inc. v. Melton*, 689 F.2d 281, 287–89

[21] *See* Foley, *supra* note 3 (explaining that ICE responded to a reporter's inquiry about the ODLS Final Order Policy with a statement that neither confirmed nor denied the existence of the policy but explained ICE is "prioritiz[ing]" those with final orders of removal amidst a "historic number of injunctions from courts stopping individual removals") (quotation marks omitted).

(1st Cir. 1982) ("[L]egal advocacy organizations have first amendment rights which, in appropriate circumstances, may permit them to seek out clients and initiate litigation.").

Policies or actions that unreasonably impede communication between attorneys and detained people implicate attorneys' First Amendment rights. *See Jean v. Nelson*, 711 F.2d 1455, 1508–09 (11th Cir. 1983). The First Amendment's protections extend to all stages of communication between attorneys and detained people, including prior to representation. *See, e.g.*, *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 644–45 (6th Cir. 2015); *Immigr. Defs. L. Ctr. v. Mayorkas*, No. CV 20-9893, 2023 WL 3149243, at *34–35 (C.D. Cal. Mar. 15, 2023). Defendants' policy of excluding certain people from ODLS burdens the attorney-client relationship and implicates these First Amendment rights: "[i]t is an obvious point, but the inability to locate a client makes representation of that client substantially more difficult"—and for Plaintiffs, at times impossible. *Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 825 F. Supp. 3d 858, 870 (D. Minn. 2026).

When considering whether a detention policy or practice violates First Amendment rights, courts typically examine: (1) whether there exists "a valid, rational connection between the [challenged] regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open," (3) "the impact accommodation of the asserted constitutional right will have on guards and other [detained people], and on the allocation of [detention] resources generally," and (4) "the absence of ready alternatives" to the detention regulation. *Turner v. Safley*, 482 U.S. 78, 89–91 (1987) (citation modified); *see also Kuperman v. Wrenn*, 645 F.3d 69, 74 (1st Cir. 2011) (citing *Turner*).[22] Under these factors, Defendants' ODLS policy violates the First Amendment.

[22] The *Turner* test applies to restrictions in prisons holding people following a criminal conviction, but immigration detention is "civil, not criminal." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Restrictions in immigration detention

First, no legitimate governmental interest supports excluding people from ODLS, as other courts across the country have already recognized in reviewing instances in which the government has otherwise excluded detainees from this locator. *See, e.g.*, *Sendra Gonzalez*, 2026 WL 3181907, at *2; *Barco Mercado v. Mullin*, No. 25-CV-6568 (LAK), 2026 WL 2874458, at *38 (S.D.N.Y. Sept. 24, 2026) (in issuing permanent injunction, finding "[n]o legitimate governmental interests could justify" deprivations of access to counsel including by "failing to update the location of detainees in [ICE's] online tracker such that attorneys were unable to find their clients"); *Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 820 F. Supp. 3d 789, 806 (D. Minn. 2026) (finding failures to list people on ODLS "not rationally related to a legitimate purpose" because the government did "not explain [its] purpose in . . . failing to timely notify counsel of their clients' location"); *Moreno Gonzalez v. Noem*, No. 25 C 13323, 2025 WL 3170784, at *2 (N.D. Ill. Nov. 5, 2025) (ordering defendants to list putative class members on ODLS).[23] Here, Defendants have not offered *any* justification for the new exclusion policy, instead making the change without notice to the public and without explaining why people with final orders of removal should no longer be listed in ODLS. Not only can Defendants cite no legitimate interest in excluding people from ODLS; their own prior statements reveal that the ODLS Final Order Policy *undermines* important interests. ICE has historically pointed to ODLS as part of its efforts to "enhance

---

must reflect that the people detained there "are entitled to more considerate treatment and conditions of confinement" than people with criminal convictions "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). While a more lenient standard than *Turner* should therefore apply here, *Benjamin v. Fraser*, 264 F.3d 175, 187 n.10 (2d Cir. 2001); *Demery v. Arpaio*, 378 F.3d 1020, 1028–29 (9th Cir. 2004), this Court need not consider the contours of such a test where Plaintiffs readily satisfy even the more burdensome *Turner* test.

[23] Defendants themselves have recognized that the practice of excluding some people from ODLS is vulnerable under the First Amendment. *Espinoza Escalona v. Noem*, No. 25-cv-00604, ECF No. 14-2, ¶ 17 (D.D.C. Mar. 10, 2025) (in response to First Amendment claim based in part on defendants' exclusion of people held at Guantánamo from the ODLS, informing the court that "[t]he ICE Detainee Locator has been updated to reflect [their] current location"); *H.C.R. v. Noem*, 25-cv-00747, ECF No. 166-1, ¶ 5 (M.D. Fla. Nov. 14, 2025) (in response to First Amendment claim, informing the court that "DHS began implementing procedures to update detainee location information relating to [noncitizens] detained at [Alligator Alcatraz] to the Online Detainee Locator System (ODLS)").

individuals' access to legal resources and representation while in ICE custody."[24] ICE has also historically directed "family or child dependency court officials [and] child welfare case workers or other child welfare authorities" to ODLS to connect children with their detained parents in furtherance of the governmental interest in not "unnecessarily infring[ing] upon the legal parental or guardianship rights and obligations."[25]

Second, Defendants' policy apparently leaves no workable alternative means for Plaintiffs to locate their detained clients and provide legal counsel. As described *supra* at Background, pp. 2-7, various alternatives for attempting to contact ICE or discern the location of a detained person—such as calling or emailing ICE directly, calling the DRIL hotline, or relying on ERO eFile—are not generally viable. *See* Leban Decl. ¶¶ 12–13 (practitioner called and emailed ICE field office multiple times to no avail); Narayanan Decl. ¶¶ 8, 12–13 (attorney could not get staff at multiple detention facilities to pick up the phone or provide any information; left multiple voicemails to ICE but never received a response); Metelska Decl. ¶ 7; Boyer Decl. ¶¶ 10–11 (emails to ICE went unanswered); Mayer-Salins Decl. ¶ 29 (DRIL hotline staffer responded referencing ODLS after 24 hours); de la O Decl. ¶ 20 (only 45 detention facilities nationwide have ERO eFile); Romero Decl. ¶ 18 (noting that Wyatt Detention Center in Rhode Island does not use ERO eFile). Similarly, detained clients have encountered barriers to contacting lawyers. Morgan Decl. ¶ 16 (facilities do not generally allow a call upon arrival and some clients "appear unable to contact [counsel] for several days after their initial detention or transfer"); Thompson Decl. ¶ 13 (client was not permitted to call his lawyer even though he repeatedly begged ICE officers at the

---

[24] ICE, *Legal Access in Detention at a Glance* (Aug. 2021), https://www.ice.gov/doclib/detention/LegalAccessAtAGlance.pdf [https://perma.cc/8URM-CHDN] (last visited Oct. 28, 2026).

[25] ICE, *ICE Detained Parents Directive* (Aug. 11, 2025), https://www.ice.gov/detain/parental-interest [https://perma.cc/PD9G-ZMSF] last visited Nov. 4, 2026). Defendants' new policy weakens ODLS and undercuts these important governmental interests.

various facilities he was transferred to); Ghabra Decl. ¶ 10 (client had difficulty contacting attorney and was only able to after several weeks, losing valuable time to obtain necessary legal services); Narayanan Decl. ¶¶ 9–10, 13 (client had to use another detainee's phone account to call his attorney, as his commissary account did not transfer over when Defendants transferred him to a new facility); Leban Decl. ¶ 8 (client reported he would lose phone access soon).

Third, it would impose little burden on Defendants to eliminate their policy of disappearing people with final orders of removal from ODLS. To the contrary, doing so would likely *remove* burdens. Pausing the implementation of the ODLS Final Order policy would remove an additional burden on the system, as Defendants have seemingly added an additional step to prevent people from being included in ODLS, as those people's inclusion in the ODLS would otherwise happen automatically.[26] The creation of ODLS was intended to help the public "to locate detainees more quickly and efficiently," relying on automatic data queries rather than requiring ICE officers to answer inquiries by phone.[27] ICE has emphasized that "the [ODLS] tool frees up time for ICE employees to focus on carrying out other responsibilities,"[28]—time that now must be spent responding to inquiries about people who no longer appear on the locator.

Fourth, a ready alternative to Defendants' recent policy change does exist: returning to the 16-year status quo of including all people in ODLS, regardless of procedural posture.[29]

---

[26] *See Privacy Assessment*, *supra* note 2.
[27] *See* 75 Fed. Reg. 23274, 23274 (May 3, 2010).
[28] *Holiday on Ice: The U.S. Department of Homeland Security's New Immigration Detention Standards Before the Subcomm. on Immigration Policy and Enforcement* 112th Cong. 20-30 (2012) (statement of Kevin Landy, Assistant Director, Office of Detention Policy and Planning, U.S. Immigration and Customs Enforcement).
[29] In 2007, the First Circuit held in *Aguilar v. ICE* that alleged noncitizens in "pending or imminent" removal proceedings were barred by 8 U.S.C. § 1252(b)(9) from raising a claim of denial of access to counsel, because such claims can be channeled through the administrative proceeding. 510 F.3d 1, 13-14 (1st Cir. 2007). Here, however, Plaintiffs represent people who have purportedly completed those administrative proceedings, and are not (at least in this lawsuit) "asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *DHS v. Regents of the Univ. of Cal.*., 591 U.S. 1, 19 (2020) (citation modified). Nor do they have any apparent alternative forum in which to raise these claims. *See Aguilar*, 510 F.3d at 11 ("[S]ection 1252(b)(9) is a judicial channeling provision, not a claim-barring one."); *see also Kong v. United States*, 62 F.4th 608, 613–18 (1st Cir. 2023) (explaining *Aguilar* and holding district court had jurisdiction over plaintiff's claims, where

## II. The ODLS Final Order Policy irreparably harms Plaintiffs.

As described in the accompanying declarations, the ODLS Final Order Policy is inflicting severe and irreparable harm on the Plaintiffs. *See supra* Background. Additionally, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Where Plaintiffs "have made a strong showing of likelihood of success on the merits of their First Amendment claim, there is no need for an extensive analysis of irreparable harm, as such harm is presumed." *Schiff v. U.S. Off. of Pers. Mgmt.*, 784 F. Supp. 3d 380, 396–97 (D. Mass. 2025) (internal quotation marks omitted) (quoting *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11, 15 (1st Cir. 2012)). Indeed, constitutional harms are generally irreparable given that they are "not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).

Here, Plaintiffs' harms cannot be sufficiently remedied by subsequent relief. Plaintiffs have a right to communicate and associate with existing and prospective clients, even after those clients have received final orders of removal, and to pursue additional legal proceedings—including habeas claims and challenges to their conditions of confinement. Communication between Plaintiffs and their clients is often outcome determinative for Plaintiffs' ability to succeed in the advocacy at the core of their work. Many of those clients will likely face premature deportation,

plaintiff had a final order of removal and brought claims challenging government's detention conduct in connection with its attempt to execute that order). Additionally, *Aguilar*'s statement that "[noncitizens] have no constitutional right to counsel in removal proceedings" is irrelevant here, as, in context, the First Circuit was plainly contrasting noncitizens' statutory right to counsel with the inapplicability of the Sixth Amendment right to counsel generally applicable in criminal proceedings. *Aguilar*, 510 F.3d at 13 (citing *Lozada v. INS*, 857 F.2d 10, 13 (1st Cir. 1988), which addressed the inapplicability of Sixth Amendment rights and acknowledged the availability of due process claims relating to denial of effective assistance of counsel in deportation proceedings). That reasoning does not foreclose a First Amendment claim by attorneys representing people with purportedly complete removal proceedings.

prolonged detention, a detrimental lack of access to medical care,[30] or other irreversible consequences before their attorneys can locate them, let alone communicate with them. *See Sampiao v. Hyde*, 799 F. Supp. 3d 14, 26 (D. Mass. 2025) (irreparable harm from prolonged detention); *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 658 (D. Mass. 2018) (irreparable harm from premature deportation); Narayanan Decl. ¶¶ 15–17, 19 (client removed to country where he had a fear of persecution); Boyer Decl. ¶¶ 4, 13–14 (client removed to country where he feared torture and was in fact imprisoned immediately upon arrival); Metelska Decl. ¶¶ 20–21 (client lost opportunity to apply for relief that he was eligible for and lost pending T visa application); Thompson Decl. ¶¶ 11–14 (transfers of client with severe mental illness impeded attorney advocacy, and client ultimately removed to third country and was subsequently imprisoned). Since the new ODLS Final Order Policy came into effect, legal services practitioners, judges, and client families have been severely impeded in their work and efforts to connect with family. Without accurate location information provided by ODLS, attorneys are unable to confirm whether their clients have been transferred or if they have been removed from the United States, and Plaintiffs cannot undo the substantive harm to a client's case caused by the delay in locating them created by this Policy. Boyer Decl. ¶¶ 7–8. Clients subject to a final order of removal are in a critical case posture in which speedy communication and action is necessary to retain their rights. *See* Thompson Decl. ¶¶ 21–22; *see also Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 875, 881–82 (C.D. Cal. 2025) (explaining that "[g]overnment action that frustrates an organization's core mission gives rise to irreparable harm," and finding impediments to plaintiffs' ability to represent immigrants and refugees constituted irreparable harm).

---

[30] *See, e.g.*, St. John Barned-Smith et al., *ICE hasn't paid for detainee medical care since October. Advocates call it a 'death policy,'* San Francisco Chronicle (Sept. 2, 2026), https://www.sfchronicle.com/politics/article/ice-detainee-medical-care-22384190.php. *See also* Morgan Decl. ¶¶ 10, 13, 20 (describing advocacy related to medical conditions).

While some people can make phone calls to their attorneys from detention, this is not a reliable method of locating clients because commissary is often not transferred with clients and phone access can be limited. Narayanan Decl. ¶ 9; Thompson Decl. ¶¶ 13, 17; Leban Decl. ¶ 15. Detained people have also reported that they often do not know where they are being detained and that detention center staff and ICE refuse to share that information despite repeated questions. Thompson Decl. ¶ 13; Narayanan Decl. ¶ 13. Moreover, the ERO eFile call scheduling system and DRIL hotline are not reliable tools for locating detained people across jurisdictions. *See* de la O Decl. ¶¶ 20. Due to the inability of attorneys to locate their clients, people have suffered needlessly prolonged, unlawful detention and removal to countries where they face persecution, mortal fear, and/or have no connection. *See* Narayanan Decl. ¶¶ 16–17; Thompson Decl. ¶ 14.

Additionally, the Policy has impaired the ability of some judges to properly manage their dockets. As judges in some jurisdictions check ODLS to determine whether a person is still detained, they may delay decisions on habeas petitions when they are unsure if the matter has been mooted by a person's possible release. *See* Boyer Decl. ¶ 18; Ghabra Decl. ¶ 8. For people in criminal proceedings, being taken into ICE custody often prevents them from attending hearings in their criminal case. In the past, a simple search on ODLS could excuse their absence in some jurisdictions. Now, however, people in ICE custody may be subject to bench warrants in their criminal cases and other deleterious effects due to the Policy. *See* Thompson Decl. ¶ 18. Defendants' practice of effectively disappearing detained people inflicts clear irreparable harm.

Indeed, courts around the country have found irreparable harm when DHS has restricted attorney-client communications under other circumstances. *See, e.g.*, *H.C.R. v. Mullin*, 825 F. Supp. 3d 1267, 1306 (M.D. Fla. 2026) (irreparable harm demonstrated by DHS preventing "exercising … First Amendment rights to consult with and have advice and assistance from legal

counsel"); *Gomez Ruiz v. U.S. Immigr. & Customs Enf't*, 834 F. Supp. 3d 835, 850 (N.D. Cal. 2026) ("[T]he denial of meaningful access to counsel likewise constitutes irreparable harm, particularly given the complexity of immigration procedures, and the enormity of the interests at stake" (internal quotation marks omitted)); *Barco Mercado v. Noem*, 800 F. Supp. 3d 526, 550, 565 (S.D.N.Y. 2025) (finding irreparable harm where attorneys could not access clients in part because ODLS did not reliably show whether located at certain facility), *appeal dismissed sub nom. Barco Mercado v. Noem*, No. 25-2922, 2026 WL 1382401 (2d Cir. Mar. 3, 2026).

Furthermore, courts have concluded that attorneys' inability to locate clients in ICE's ODLS in other circumstances constitutes irreparable harm. *See, e.g.*, *Advocs. for Hum. Rts.*, 820 F. Supp. 3d at 796, 809 (finding irreparable harm from Fifth Amendment violation where ICE restricted access to counsel including by not "accurately or timely input[ting] information into the Online Detainee Locator System," which "prevent[ed] Minnesota-based attorneys from locating and speaking with their clients"); *Reyes v. U.S. Immigr. & Custom Enf't*, No. 2:25-CV-01159, 2025 WL 3724847, at *2 (D. Utah Dec. 24, 2025) (finding irreparable harm based on an infringement of First Amendment rights, where detained individual could not be located through ICE's systems and "effectively disappeared").

## III. The balance of the equities and the public interest strongly favor a stay.

The final two factors a court must consider when granting a stay—balance of hardships and public interest—merge when the government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Together, the factors strongly favor Plaintiffs. "[T]here is generally no public interest in the perpetuation of unlawful agency action"; the public has a substantial interest in ensuring the government complies with the law. *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (quotation omitted). A stay would advance the public interest by pausing a policy that

disappears family and community members across the country, hiding them from their loved ones and their legal representatives and making a wide variety of time-sensitive legal interventions impossible. *See supra* Section II. A stay would also ensure that detained people have access to advocates to ensure they are receiving critical healthcare and are not subject to wrongful conditions of confinement. *See* Thompson Decl. ¶¶ 8, 20.

Conversely, the government will suffer no harm from eliminating a policy at odds with its 16-year practice of disclosing the location of detained people with final orders. *See Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *32 (D.C. Cir. Nov. 22, 2025) (rejecting government's arguments as to alleged burden, finding no harm when stay "maintains the status quo that has existed for decades"); 75 Fed. Reg. 23274–79 (May 3, 2010) (describing launch of ODLS as including all noncitizens in DHS custody). The interests of detained people in communicating with their family and counsel and pursuing legal relief outweigh any burden on DHS. And DHS, like all government agencies, has no legitimate interest in enacting policies targeted solely at compromising rights and disrupting the orderly function of the legal system.

The notion that people can be "disappeared" has a long and tragic history in authoritarian regimes around the globe, and its legacy has had disastrous and often deadly consequences for millions of people. Now is not the time to begin such practices in the United States of America.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion to stay the ODLS Final Order policy pending the conclusion of this litigation.

Dated: November 4, 2026 Respectfully Submitted,

/s/ *Jennifer M. Herrmann*
Jessie J. Rossman (BBO No. 670685)
Daniel L. McFadden (BBO No. 676612)
Jennifer M. Herrmann (BBO No. 708231)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS,
INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
dmcfadden@aclum.org
jherrmann@aclum.org

Cassandra Charles* (GA Bar No. 068176)
Kevin Siegel* (NY Bar No. 5800511)
Imani R. Franklin* (DC Bar No. 90006160)
Jia Fu* (NY Bar No. 6294607)
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, D.C. 20043
Tel.: (213) 639-3900
Fax: (213) 639-3911
charles@nilc.org
siegel@nilc.org
franklin@nilc.org
fu@nilc.org

Stephanie M. Alvarez-Jones* (GA Bar No.
237979)‡
Tess Hellgren* (FL Bar No. 1018834) ++
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
(National Immigration Project)
1763 Columbia Road NW
Ste 175 #896645
Washington, DC 20009
T: (202) 470-2082
T: (202) 474-3672
stephanie@nipnlg.org
tess@nipnlg.org

Kyle Virgien* (CA Bar No. 278747)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, 7th Floor
San Francisco, CA 94104
Telephone: (415) 343-0770

Angélica César* (AZ Bar No. 041321)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Telephone: (202) 549-2500

Annelise Maia Jatoba de Araujo (BBO No.
669913)
ANNELISE ARAUJO LAW LLC
260 Franklin Street, Suite 520
Boston, MA 02110
Telephone: 617-716-6400
annelise@annelisearaujolaw.com

*admitted *pro hac vice*

‡ *Not admitted in DC; working remotely from and admitted in Georgia*
ꟸ *not admitted in DC; working remotely from and admitted in Florida*

*Counsel for Plaintiffs*