**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GREATER BOSTON LEGAL SERVICES, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, et al.,<br><br>*Defendants*. | C.A. No. 26-14869-ADB |

**DECLARATION OF JACQUELINE M. KELLEY**

I, Jacqueline M. Kelley, declare as follows:

1. I am an attorney licensed in the Commonwealth of Massachusetts. I graduated from Georgetown University in 2007 with a degree in French and Linguistics. I graduated from Northeastern University School of Law with a Juris Doctor in 2016. I was admitted to the bar of the Commonwealth of Massachusetts in November 2016. I am a member of the bar in good standing in all jurisdictions in which I am admitted.

2. I have been employed at the Rian Immigrant Center, Inc. ("Rian") for roughly ten years, since 2016. I have had several positions within Rian during that time. From 2016 to 2021, I worked as a Legal Fellow and then Immigration Attorney. From 2021 to 2025, I worked in supervisory roles as Senior Immigration Attorney, Manager of Medical-Legal Partnerships, and Associate Director of Attorney Supervision. My current position at Rian is Director of Immigration Legal Services, which I have held since in or around February 2025.

3. Throughout my career, I have personally represented hundreds of clients in immigration matters. In my current role as Director of Immigration Legal Services, I continue to personally represent clients in such matters. I also supervise a team of attorneys who represent clients in immigration matters, as well as staff and interns who assist those attorneys. I presently supervise a team of five attorneys, one legal fellow awaiting admission to the bar, two paralegals, and one intake specialist. I am familiar with the policies, practices, and operations of Rian's legal services program for immigration matters. I am also familiar with Rian's structure, operations, and organizational history.

4. Rian is a non-profit entity organized under the laws of Massachusetts. Rian's offices are located in Boston, Massachusetts. Rian and its predecessor organizations have been providing immigration-related services in Massachusetts since in or around 1989. My understanding is that the organization was originally formed as the Emerald Isle Immigration Center by a group of Irish immigrants in or around 1989. The organization changed its name to the Irish Immigration Center in or around 1992, and then to the Irish International Immigrant Center in or around 2010. In or around 2020, the organization changed its name to the Rian Immigrant Center. My understanding is that the word "Rian" in Irish refers to a path, and its use has been intended to represent the many life-affirming pathways the organization helps immigrants to forge here in the United States. Although the organization was originally founded with a focus on providing services to immigrants of Irish origin, today Rian provides immigration assistance to immigrants and refugee families from all over the world, including from countries in Europe, Africa, Asia, the Americas, and the Caribbean.

5. Rian provides a variety of immigration-related legal services to its clients. Among other things, Rian's legal staff provide free legal consultations to immigrants, refugees, and

asylees. Rian's legal staff also provide full case representation before U.S. Citizenship and Immigration Services ("USCIS") and other federal agencies for approximately 800 people each year. We offer these legal services regardless of the person's ability to pay. We provide these legal services for free, except that we sometimes ask clients with adequate resources to pay a small administrative fee to account for expenses like postage.

6. Among other things, Rian provides legal services to assist immigrants, refugees, and asylees with matters such as: family-based petitions and applications for adjustment of status to lawful permanent residence; consular processing; T visas for victims of human trafficking; U visas for victims of certain crimes; petitions for status for domestic violence victims under the Violence Against Women Act ("VAWA"); medical deferred action; special immigrant juvenile ("SIJ") status for victims of childhood abuse, neglect, or abandonment and related state family court representation;[1] temporary protected status applications and renewals; form I-730 petitions to re-unify asylee and refugee family members; and naturalization.

7. Rian presently represents more than 10 people who have final orders of removal, including at least eight who have pending matters before USCIS, and including at least three others for whom Rian has been engaged to file matters before USCIS in the near future. The majority of our clients with final orders of removal (including those described in the preceding sentence) are presently pursuing relief and/or other requests only before USCIS. Presently, as far as I have been able to determine, Rian has approximately three clients with final orders who have matters pending

[1] SIJ status is a special process that allows certain noncitizens to adjust to lawful permanent resident status. There is generally a delay of several years between receipt of SIJ status and actual adjustment to lawful permanent resident status, during which time the noncitizen is essentially on a waiting list. Thus, although SIJ status is colloquially referred to as a form of "status," some courts have held that, during that interim period between receipt of SIJS status and adjustment of status, the noncitizen remains removable. *See, e.g.*, *Cortez-Amador v. Attorney General*, 66 F.4th 429, 433 (3d Cir. 2023).

in Immigration Court, and in each case the matter is a motion to re-open removal proceedings that is pending before an Immigration Judge. Some of these people have progressed quite far in their process through USCIS, including, for example, having a U visa application with a bona fide determination from USCIS, and having approved SIJ status and waiting in the backlog to complete adjustment. Others are still quite early in the application process, with applications either being currently prepared or having been recently submitted. Some of these people are on government-issued Orders of Supervision ("OSUPs"), which, among other things, require periodic in-person check-ins with ICE.

8. As Rian continues to conduct intakes for, and be engaged by, new clients in immigration matters, it is highly likely that some of these new clients will have final orders of removal, as well.

9. Based on my observations of ICE's recent enforcement activity in the community, it is my understanding that U.S. Immigration and Customs Enforcement ("ICE") currently takes the position that it may arrest and remove any person with a final order of removal, even if that person has an application for status pending with USCIS or is eligible to submit such an application, unless there is a court order to the contrary. ICE carries out these arrests at various times (including during in-person check-ins for people on OSUPs), generally without advance notice. Rian's clients who have final orders of removal therefore face a significant risk of arrest, detention, and deportation. In such cases, prompt action by counsel may be necessary to protect their rights, including potentially filing motions to re-open removal proceedings, filing or engaging counsel to file a petition for writ of habeas corpus challenging the legality of such detention, and attempting to expedite or otherwise resolve pending applications for status.

10. There are additional factors which require prompt action in the event a client with a final order of removal is arrested. One of these is that the government has adopted a policy of deporting some people to countries that are not their country of origin, to which they have no connection, and in which they may face persecution or other maltreatment. *See, e.g.*, *D.V.D. v. DHS*, No. 26-cv-1212, 2026 WL 2797801 (1st Cir. Sept. 18, 2026), *judgment stayed by*, 2026 WL 2917860 (U.S. Sept. 29, 2026). A prompt habeas petition may be necessary to protect clients who may be subject to this policy. If a prospective client who has contacted us for assistance is detained, we would normally locate them through ODLS and file a habeas petition on their behalf before they are transferred. Even a short delay caused by the inability to locate a detained person could result in their transfer to a different jurisdiction or a third country. Because we do not represent clients outside of Massachusetts, the inability to promptly locate a prospective client who is then detained would make it impossible to provide legal services to people we otherwise would have assisted as part of our core mission.

11. ICE maintains a network of detention facilities across the United States. Providing services to a client in detention therefore necessarily requires identifying the facility in which they are located. Among other things, ascertaining the facility of detention is necessary to conduct phone calls, video conferences, and in-person visits; to determine the proper district to file any petition for writ of habeas corpus (which ordinarily must be filed in the district encompassing the location of detention); to communicate with the client about pursuing potential relief from removal, such as filing a motion to re-open the removal proceedings; to secure information from the client concerning the circumstances of arrest and the client's current physical, medical, and mental condition; to communicate with the client to continue processing pending applications for status with USCIS; to schedule certain in-person processes that are necessary to complete

applications for status, such as biometrics appointments; to communicate with the client to respond to any requests for evidence that USCIS may transmit while adjudicating an application for status; and to consult with the client in any and all matters which, under the ethical rules governing attorneys and other standards of professional conduct, the client's consent or consultation may be required or advisable to provide adequate representation and to avoid potential ethics complaints and/or professional liability claims.

12. By excising people with final orders of removal from ODLS, the government has cut off access to information that is necessary to Rian's ability to fulfill its core business activities of providing immigration assistance to people in Massachusetts. If Rian cannot ascertain the location of clients or prospective clients arrested by ICE through ICE's detainee locator, it will be impossible to gather the information and engage in the client communication we need to provide legal assistance, such as ongoing U-visa applications. Rian will be forced to expend substantial additional resources to locate clients in order to conduct the functions described above. For example, Rian's staff will likely be required to expend their limited resources to undertake tasks such as calling around to multiple detention centers to ask whether the client is detained there, with no guarantee that they are contacting the correct detention centers and no guarantee that those detention centers will be responsive to the inquiry. If that is not successful, then Rian's staff will be required to attempt to identify other courses of action to locate Rian's clients, such as calling government agencies and making inquiries to family members about what, if anything, they may have heard about their loved one's location and condition. In the meantime, Rian will be forced to undertake additional work to delay, postpone, and reschedule events in pending applications with USCIS, such as appointments and submissions that USCIS may require to complete the applications. This delay and additional burden not only diverts resources, but also, in some cases,

will make it entirely impossible to assist prospective or existing clients. For example, we would be unable to respond to requests for evidence or biometric appointments necessary to a client's case if we cannot locate them, and we will be unable to serve people we normally would if they are transferred or removed before Rian can locate them to intervene.

I declare, under the penalty of perjury, that the foregoing is true and correct.

Executed on November 3, 2026 in Boston, Massachusetts.

Jacqueline M. Kelley