**DECLARATION OF LAURA ST. JOHN**
**FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT**

I, Laura St. John, make the following declaration based on my personal knowledge and declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1. I am the Legal Director of the Florence Immigrant & Refugee Rights Project ("FIRRP").
2. I have practiced as an immigration attorney in Arizona with FIRRP for over fifteen years. I have worked as a Staff Attorney, Managing Attorney, and Legal Director at FIRRP. I have served as Legal Director since December 2015. In all my roles at FIRRP, I have provided free legal services primarily to adults who are facing removal and are detained in U.S. Immigration and Customs Enforcement ("ICE") custody in Florence and Eloy, Arizona.
3. As Legal Director, I manage FIRRP's legal advocacy. This includes FIRRP's practice in the federal district courts for habeas petitions and other civil litigation as well as FIRRP's appellate practice before the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") as well as appeals to the Board of Immigration Appeals ("BIA"). With others, I also supervise staff and direct the provision of services across our children, adult, and social service programs. I work particularly closely with our programs serving detained adults, mentoring staff in cases that raise complex or novel issues in the areas of asylum, withholding of removal ("withholding"), and Convention Against Torture ("CAT") protections, and in cases that involve individuals with serious mental illness, the intersection between criminal and immigration law, and major due process violations.

4. FIRRP is also widely known for developing resources specifically targeted to assist *pro se* respondents in immigration proceedings. FIRRP's *pro se* guides have been distributed in detention centers throughout the country. In my role as Legal Director, I oversee staff and contractors working to update and develop these materials.
5. I also provide support to train, mentor, and supervise FIRRP staff and pro bono attorneys handling a wide variety of immigration matters.
6. I previously served the Ninth Circuit as an Appellate Lawyer Representative, where I began serving as an immigration mentor to pro bono attorneys before the Ninth Circuit. As an Appellate Lawyer Representative, I also helped develop a pilot pro bono program to supplement the Court's traditional pro bono program, expanding pro bono placement opportunities with skilled immigration practitioners to better address both the complexities of immigration law and the high rate of non-representation in immigration petitions for review ("PFRs"). FIRRP continues to regularly accept pro bono representation before the Ninth Circuit through this pilot pro bono project. I also served on the Ninth Circuit's *Pro Se* Committee, working to improve access to justice for parties proceeding *pro se*.

**FIRRP's Mission, Programming, and Scope**

7. Founded in 1989, FIRRP is a non-profit organization dedicated to providing free legal and social services to the thousands of adults and children in immigration custody in Arizona.
8. With no public defender system in immigration removal proceedings, the vast majority of all detained noncitizens nationally are unrepresented in immigration court. FIRRP works to address this inequity both locally in Arizona and nationally. FIRRP's vision is to

ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely. These core values guide all of FIRRP's legal services.

9. FIRRP has a staff of approximately 125 people, including attorneys, social workers, and support staff, based in Phoenix, Tucson, and Florence, Arizona.

10. To advance our mission, FIRRP provides high-quality direct immigration legal services, education, and social services to thousands of people in DHS custody in Arizona every year. In 2025, we served over 2,000 detained adults and unaccompanied children in Arizona. Our Children's Program serves children who are detained in Office of Refugee Resettlement (ORR) custody, in long-term foster care or Unaccompanied Refugee Minors placements in Arizona, or children who were in ORR custody and have reunified in FIRRP's service areas in Arizona. Meanwhile, our Adult Program primarily serves adults who are detained in ICE custody in the three immigration detention centers located in Florence and Eloy, Arizona: Florence Detention Center ("FDC"), Central Arizona Florence Correctional Complex ("CAFCC"), and Eloy Detention Center ("Eloy"). The FDC includes a unit known as the Florence Staging Facility ("FSF") that historically was used for short-term processing of individuals into longer-term housing assignments or staging for final removal but now houses people for weeks or months. We also at times serve clients who have been transferred outside of Arizona and are now located elsewhere in the country, particularly in cases involving our clients experiencing serious mental illness, habeas clients facing potential third-country removal and clients with pending PFRs and related stays before the Ninth Circuit Court of Appeals.

11. FIRRP is the only organization providing completely free legal services to the thousands of people detained in ICE custody in Arizona. We do so through several key programs.

12. First, we educate *pro se* detained individuals about their rights in the immigration system. Despite the 2025 termination of the congressionally funded Legal Orientation Program (LOP), FIRRP legal staff still provide Know Your Rights ("KYR") legal presentations for detained *pro se* individuals. We also provide individualized orientations and consultations, one-on-one education in immigration law and procedure, *pro se* workshops on various forms of relief, and specialized *pro se* guides. FIRRP's legal orientation services are available to individuals who already have final orders of removal, and FIRRP routinely consults with individuals in that posture.

13. These legal orientations allow us to screen for cases that are eligible for further legal services from FIRRP or other pro bono attorneys. We screen for possible immigration relief, including potential motions to reopen and appellate options as well as applications to U.S. Citizenship and Immigration Services ("USCIS") for various types of legal status. We also routinely screen for potential custody issues, including ripeness for a potential habeas petition and social services, including services for pregnant women and people with severe medical or mental health needs. Additionally, we screen for other needs specific to people with final orders, including communication with a deportation officer about the status of removal efforts, travel documents, and information about third-country removals.

14. Second, our attorneys provide direct representation to hundreds of clients who are held in the three isolated detention centers we serve, FDC, CAFCC, and Eloy. FIRRP represents clients in defensive removal proceedings before the Executive Office for Immigration

Review ("EOIR") and BIA as well as in PFRs before the Ninth Circuit, petitions for writs of habeas corpus, complex or novel legal issues on appeal at the BIA, and other strategic immigration-related federal litigation.

15. FIRRP also represents clients, including those with final orders of removal, in pursuing relief and benefits from USCIS — including U and T visas, adjustment of status, asylum in the case of unaccompanied children, and employment authorization. In particular, many children in removal proceedings may also qualify for relief that they must pursue before USCIS, and FIRRP helps them navigate this complex landscape.

16. FIRRP attorneys also serve as appointed counsel for, on average, about one hundred individuals whom an immigration judge has deemed to be mentally incompetent and unable to represent themselves in removal proceedings. FIRRP receives direct funding from the federal government for such representation under our settlement in *Franco-Gonzalez* and the Department of Justice's National Qualified Representative Program (NQRP).

17. FIRRP also has a pro bono program that recruits, trains, and mentors external pro bono attorneys and places dozens of cases with those volunteer attorneys before the immigration courts, BIA, federal district courts, and the Ninth Circuit. Given changes in U.S. government policies, FIRRP has increasingly worked with pro bono attorneys to seek habeas relief for individuals with final orders of removal who have been granted withholding or CAT protection. These challenges often involve highly time-sensitive petitions, sometimes contesting removals to countries where individuals have no preexisting ties and have had no opportunity to raise claims of fear.

18. Additionally, FIRRP's social workers help legal teams develop a trauma-informed approach to their legal cases and provide specialized services to clients who are experiencing serious mental health conditions. Because most clients struggle with the experience of detention, our social workers support clients with psychoeducation and training on situation-specific coping mechanisms.

19. FIRRP's work is fast-paced, dynamic, and requires rapid communication with a broad base of clients. In 2025, we worked with clients from over 80 countries who speak more than 35 languages — almost all of whom are detained by ICE and facing removal, and most of whom have some form of proceedings before EOIR, the BIA, the federal district court, or the Ninth Circuit. To do this work effectively, we rely on ICE's Online Detainee Location System (ODLS) on a daily basis. The recent changes to ODLS have already interfered significantly with FIRRP's ability to provide our core services and will continue to have a tremendously detrimental impact on the people we serve.

**<u>Legal Needs of Clients with Final Orders of Removal</u>**

20. Across programs, FIRRP attorneys and staff routinely provide legal and social services to individuals who have final orders of removal, including both full representation and *pro se* orientation and support. FIRRP encourages all non-citizens in ICE custody to attend our KYRs and free legal consultations, including individuals who are in reinstated removal proceedings or are otherwise post-final order of removal. As such, historically FIRRP staff routinely met people who were in post-final order of removal status but who nonetheless needed information regarding options in their cases.

21. FIRRP routinely works with individuals in ICE custody who have final orders of removal. Florence is a significant hub for ICE detention and removal operations, and ICE regularly transfers individuals from other detention facilities across the country, to Florence and sometimes Eloy to execute removal orders. Thus, Florence and Eloy house a substantial number of individuals with final orders of removal.

22. This category of individuals with final removal orders includes a broad range of cases with various significant legal needs. For example, individuals who are post-final order include not only those awaiting removal, but also those who were ordered removed but granted protection through withholding or CAT to prevent their removal to their country of origin. Such individuals often have complex legal needs, including potential support with motions to reopen; other avenues for relief through affirmative applications with USCIS; and habeas assistance if they are subject to third-country removal without proper process, are unlawfully re-detained after having been released on an Order of Supervision ("OSUP"), or face unconstitutional indefinite detention. Individuals who re-entered the country following a prior order of removal and have had their prior order reinstated are also technically post-final order, even if they are actively challenging the validity of their reinstated order or pursuing a protection claim through reasonable fear interviews, withholding-only proceedings, and PFRs. Lastly, any individual who has completed the administrative review process of their removal order has an administratively final order of removal, even if they are actively undergoing federal court review of the agency decision through a PFR before the Ninth Circuit.

23. Additionally, conditions in ICE detention centers are often atrocious. FIRRP assists individuals who wish to file complaints regarding detention conditions or abuse. These

include complaints to oversight agencies, like the Office of Civil Rights and Civil Liberties and the Office of Inspector General. It also includes support ranging from helping individuals file administrative claims for damage, injury, or death; submitting complaints to the United Nations; and issuing regular public reports on conditions. Additionally, in more egregious cases, FIRRP works with individuals who have colorable claims for federal relief under the Rehabilitation Act or the Federal Tort Claims Act ("FTCA") as a result of wrongs they have experienced while in ICE custody. Individuals in need of this support oftentimes have final orders of removal.

24. The profile of our detained clients with final orders of removal has shifted. Since 2025, we have observed a significant increase in the number of individuals apprehended and detained by ICE despite having received final orders of removal months or even years earlier. These individuals include those who remained in the United States for extended periods following the conclusion of their immigration proceedings or who were released on OSUP, and those who were granted relief in the form of withholding or CAT. In the cases of individuals who secured protection claims, we have seen individuals with older and newer grants be detained and re-detained by ICE. In addition, we have had several post-final order detained clients with grants of withholding or CAT who were released as a result of a habeas petition be subsequently re-detained weeks later in renewed attempts to remove them.

25. All of the categories of people described above are existing or potential FIRRP clients who have been removed from ODLS. Many are seeking or need time-sensitive assistance, and because of the recent change to ODLS, FIRRP staff cannot identify their location in a timely fashion. By definition, people with final orders of removal are in an extremely

precarious position. When we cannot locate them, we cannot respond timely to emergencies and continue to advocate effectively on their behalf — a fundamental aspect of our work.

**<u>Effects of the ODLS Policy Change on FIRRP's Services and Operations</u>**

26. The September 15, 2026, policy of removing people with final orders from ICE's ODLS has disrupted several core functions of our legal services organization:

*Identifying location of existing clients who may have been transferred or removed*

27. First, FIRRP has regularly used the ODLS to determine the whereabouts of existing clients who may have been removed from the United States or transferred to another detention facility. In over 15 years of experience working with detained adults in Arizona, I have observed that transfers between immigration detention facilities are common. ICE routinely transfers detained individuals from one facility to another, sometimes across state lines and over considerable distances. Transfers between ICE facilities, particularly for people who are post-final order and facing imminent removal have become increasingly common since 2025. Transfers typically occur with little or no advance notice to detainees or their counsel, including in cases involving clients who FIRRP has been appointed to represent as a result of their serious mental health conditions. Transfers can significantly disrupt attorney-client communications, access to legal documents, and ongoing legal proceedings. Historically, FIRRP has relied heavily on the ODLS to identify when a client has been transferred, learn of the client's new location, and obtain information needed to establish communication or arrange a legal visit.

28. Access to the ODLS has been particularly important given that ICE has removed or attempted to remove a significant number of our clients with final orders of removal to third countries — a prospect that requires immediate intervention through habeas, requests for emergency fear screenings, and emergency motions to reopen. ODLS allowed us the ability to monitor the whereabouts of clients whose detention locations changed during representation or who might be subject to possible third-country removal. Although the ODLS system did not reliably confirm whether an individual had been removed, it was an important tool for identifying changes in detention status and determining when further inquiries with ICE were necessary as well as determining the proper venue for habeas petitions.

29. Similarly, for our clients with pending PFRs, we historically relied on ODLS to ascertain a client's location if they were transferred. Given recent changes in the Ninth Circuit's stay practice, the ability to timely and quickly identify where a client has been moved, or if they have been physically removed, is incredibly important to determine necessary next steps in the litigation, including stay motions.

30. Now, since the recent ODLS policy change, in some cases it has become impossible to learn a client's location following a facility transfer in time to provide effective representation. Clients often cannot inform us about a transfer in a timely manner because of logistical barriers that detained individuals face in contacting counsel. Based on my experience with the detention facilities in Arizona, it routinely takes several days before a person newly booked into a detention facility gains access to the systems for making phone calls. Since phone calls from detention facilities typically require payment, each facility has its own system for phone calls, and there are often administrative backlogs in

getting a newly booked-in individual established in the phone and payment system to make either paid or collect calls. Without either access to ODLS or phone calls from our clients following transfers, FIRRP staff cannot reliably identify a client's location and therefore often cannot communicate with clients in this posture after transfer.

31. The ODLS policy change is particularly dangerous for FIRRP's most vulnerable clients, such as those who have been deemed incompetent and unable to represent themselves. In 2025, FIRRP staff represented more than 130 such clients. Such individuals are often transferred for behavioral health treatment that is beyond the scope of what Arizona ICE facilities can provide. Sometimes, we learn about these transfers only after we have attempted to visit the client at the last known facility. When at-risk individuals are transferred without notice, they are uniquely unable to communicate with counsel regarding what happened and their new location. And such individuals are particularly prone to transfer given that their serious mental health conditions are often ill-suited for treatment in Arizona's ICE detention facilities.

32. Currently, FIRRP has a vulnerable client, Martin,[1] who entered the United States as a refugee, but was denied adjustment of status and subsequent protection under CAT. He no longer appears in ODLS. Martin has a pending PFR before the Ninth Circuit and a temporary stay of removal that may be vacated when the court issues a final ruling on his pending stay motion. Because Martin is not appearing in ODLS, FIRRP has lost the ability to quickly verify his location to ensure that he has not been removed in violation of the court order. Our experience with Martin is not an uncommon occurrence. We have faced similar situations with other FIRRP clients with limited competency, who we

---

[1] Note that I am using a pseudonym here to protect the client's confidentiality.

believe would not be able to call and alert us if they were being removed. The inability to quickly and confidently identify the location of clients like Martin also hampers efforts to communicate with clients after the PFR result to advise them on next steps and consider any available habeas relief that may be available.

*Identifying prospective clients' locations*

33. Second, the ODLS policy change also impairs our ability to locate prospective clients referred to us by families, friends, or attorneys who have had clients moved to Arizona. Because Florence, Arizona is a hub for staging removals (mostly for flights departing from the Mesa Gateway Airport), it is not uncommon for out-of-state attorneys and legal services providers to reach out to FIRRP when a client or former client is transferred to Arizona. These requests often come with urgent needs for assistance with filing documents, obtaining time-sensitive signatures, or broader requests for emergency assistance with post-final order habeas petitions, motions to reopen, stays of removal, or PFRs.

34. FIRRP also routinely receives requests for legal assistance from detained individuals and their families. Our staff regularly uses ODLS to answer questions from families who call our office inquiring about where their loved one is detained. If the person is detained in Arizona, we typically offer to add them to our next legal orientation session, but in order to add a person for any type of legal visit, we need to know the individual's location. As an initial matter, many people who contact us do not know where their loved one is in ICE custody. Additionally, because at least two of the detention facilities we cover are in Florence, we often get messages from people indicating they are detained in "Florence" without specifying FDC or CAFCC. There is also a subset of detained people who only

pass through the Florence Staging Facility ("FSF"), which is distinct from the long-term detention facilities we typically serve. So, many people who say they are in "Florence" may have only been at FSF before being removed, transferred to another facility, or transferred to their long-term bed location. All of this means that even people who identify a detention location often do not do so accurately. Prior to the policy change, if a message did not clearly state where a person was detained, our staff relied on ODLS to try to identify the individual's detention location in order to arrange to provide proper legal services.

35. We've seen the legal needs of prospective clients at these "short-term" facilities grow as the length of their stays in detention has grown. People at the FSF historically only spent a few days there for processing and/or final staging for removal flights, but now we routinely hear reports from people being held in this "short-term" detention space for multiple weeks to months. The number of people ICE detains in so-called "short-term" processing has grown so significantly in Florence that, in addition to the Staging Facility, the majority of detained people at Florence Detention Center, which used to house long-term custody individuals with active removal proceedings before EOIR, are being held for short-term detention, mostly those who are post-final order. We have seen a corresponding increase in the legal needs of individuals held in so-called "short-term" detention, the vast majority of whom are post-final order. This includes assistance with habeas cases, PFRs, motions for stay of removal, motions to reopen, conditions complaints, and advocacy for the person to be physically removed as quickly and safely as possible. For this population of potential clients in "short-term" detention and others,

we depend on ODLS to verify an individual's location as a first step to determining whether and to what extent FIRRP is able to support with legal needs.

36. Now, because of the ODLS change and because many prospective clients are post-final order, it is often impossible to confirm whether a person is in fact detained at the facilities we serve and to contact them to begin providing legal services. Many of the referrals for services we get every day do not include necessary detention location information. Recently, we have been unable to schedule services for approximately 15-25% of the general legal referrals we receive because we are unable to locate the individual in ODLS. Similarly, in a recent list of 19 individuals who we specifically identified as needing habeas support, at least 3 of those individuals could not be located in the ODLS — meaning that we could not locate more than 15% of the people whose habeas matters we intended to support to provide those services.

37. For example, a few weeks ago, an out-of-state attorney contacted FIRRP about the possibility of helping her client, Aaron,[2] file an emergency *pro se* habeas petition in Arizona. Aaron had been transferred to multiple detention centers and had filed at least one habeas petition, but that petition had not been adjudicated because of the multiple transfers. FIRRP's legal assistant attempted to locate Aaron through ODLS but was unable to find him. Because Aaron's removal defense attorney already had a video visit scheduled with him through ICE's Enforcement and Removal Operations ("ERO") eFile platform, FIRRP was able to learn where he was. But FIRRP was concerned that the facility would not allow us to visit with Aaron because he did not appear on the locator, so our staff also spent extra time calling and verifying that the visit would be allowed

[2] Note that I am using a pseudonym here to protect the client's confidentiality.

before driving approximately 1 hour to the detention facility to do the legal intake visit. A few days later, FIRRP suspected that Aaron may have been removed from the United States because his attorney's video visit was cancelled. But because ODLS never showed his location accurately, FIRRP was not able to verify whether he was still at the facility. It should also be noted that the only way we were able to initially identify his facility is because he had private counsel in his underlying removal proceeding. Most of FIRRP's potential clients do not have other counsel who can help us identify a person's location through ERO eFile. Thus, FIRRP's core function of providing access to counsel to those who otherwise lack access to private counsel is directly undermined by the loss of ODLS information.

*Identifying people who need legal orientation*

38. Third, the ODLS policy change has also had a major effect on our ability to provide legal orientation presentations. Typically, our *pro se* services cohort uses ODLS as a key tool to determine the location of detained people who contact us seeking a legal orientation.

39. ODLS has been especially necessary for scheduling legal orientations since January 2025, when LOP was terminated. Previously, when LOP was still active, EOIR would regularly send FIRRP a list of people who were scheduled to appear the following week for their first hearing before the immigration court, and ICE would send us information regarding who was detained at each of the three facilities that we serve. We used a combination of the EOIR court list and the ICE resources to identify where individuals in need of legal services were detained and to schedule them for legal orientation sessions. LOP's termination forced FIRRP staff to rely almost wholly on ODLS as the primary

means of learning of a person's detention location in order to reach them with the proper KYR services and/or a free legal consultation.

40. Now, without access to needed information in ODLS, we must schedule legal orientations essentially blind to a person's actual detention location. Without reliable location information, we cannot effectively identify, contact, or schedule prospective clients for legal orientations, particularly those with final removal orders who may face imminent removal. Recently, one of FIRRP's legal assistants was trying to verify the location of prospective clients who wished to join a legal orientation presentation, but the assistant could not reliably do so because many did not appear in any ODLS searches.

41. In practice, this means many individuals whom FIRRP's core services are designed to serve cannot access our legal orientations in a timely manner, if at all. At a legal orientation presentation at FDC this month, more than half of the individuals we included on the list were not present. Since we did not have recent rosters from ICE and the individuals were not showing up on ODLS, we did not have a way to confirm where they were being detained, to provide them necessary services. This delays, and sometimes prevents, access to legal support for the individuals who have been transferred or recently detained in Arizona detention facilities.

42. Without access to FIRRP's legal orientation, many individuals lose access to FIRRP's other services. In most cases, our initial legal screening following the group legal orientation is the gateway to additional services from FIRRP. It is there that our staff initially screens for legal needs, including eligibility for relief such as affirmative relief from USCIS, as well as potential habeas eligibility, and eligibility for other post-final order support, such as motions to reopen or assistance filing a PFR to the Ninth Circuit.

FIRRP staff also screens for conditions-related issues that may give rise to conditions complaints. If we cannot find or meet with the person with a final removal order, FIRRP's staff cannot refer the individual's case for habeas representation by a pro bono or in-house attorney or provide other services.

**Harms Resulting from the ODLS Policy Change**

43. Given these profound programmatic impacts, the ODLS policy change has interfered with our ability to fulfill our organizational mission in pivotal ways:

*Impairing our core work*

44. Because of the ODLS policy, we can no longer locate or communicate with many clients and potential clients who have final orders of removal. When we cannot locate people who have been referred to us or who call us seeking assistance, we are prevented entirely from providing our core services to those individuals. Moreover, we cannot provide timely, effective representation for existing clients when we cannot locate them. Thus, a large segment of our work involving individuals with final orders of removal has become impossible to perform.

45. When individuals do not appear in ODLS, our staff often attempts the time-consuming process of contacting ICE field offices, detention facilities, deportation officers, and detention center personnel to inquire about individuals' whereabouts. This previously unnecessary and burdensome investigation process not only diverts staff time and resources from our existing legal services, but it is also generally ineffective; it can be extremely difficult to reach to an actual ICE employee or contractor on the phone, and even when we do, they typically have not been sharing location information.

*Critical delays in access to counsel*

46. Second, the deletion of clients from ODLS has directly frustrated our mission of providing detained individuals with timely legal information, orientation, and access to representation, particularly for individuals facing imminent removal.

47. When our staff cannot locate individuals in a timely manner, the resulting delays can interfere with time-sensitive representation, including the preparation of emergency stay requests, habeas petitions, motions to reopen, PFRs, and other applications for relief before EOIR and USCIS. The delays can also impede attorney-client communications and prevent counsel from obtaining the instructions, signatures, declarations, and supporting evidence necessary to pursue legal remedies.

48. These delays also mean FIRRP's staff cannot timely identify individuals who have been removed from ODLS after a final order because they have reinstated orders of removal. The inability to quickly locate those individuals means that FIRRP is unable to provide urgent assistance with the PFR. As a result, many individuals in reinstated removal proceedings may lose their ability to appeal their ultimate order in their withholding-only proceedings to a federal court.

49. The need for prompt legal services for people who were subject to reinstatement of removal orders became all the more important after June 2025 when the Supreme Court decided *Riley v. Bondi*, 606 U.S. 259 (2025), which held that administrative decisions like the decision to reinstate a prior removal order constituted a final order of removal, such that a PFR with the Court of Appeals must be filed within 30 days of the date of reinstatement of the prior order, even if the individual is going through immigration court to assess a fear claim in withholding-only proceedings.

*Emotional turmoil*

50. Third, FIRRP clients' families also rely on ODLS. Removing individuals with final orders from ODLS causes unnecessary, additional emotional distress for their families. For example, during habeas litigation involving a client with a final order, Sarah's[3] family members noticed that she was not appearing in ODLS. Panicked and confused, Sarah's family called FIRRP desperately worried that she had been removed. We, in turn, filed emergency motions with the federal court to try and find Sarah's location. The lack of accurate information in ODLS caused Sarah's family emotional turmoil from not knowing if she had been unlawfully removed. It also created substantial emotional turmoil for our staff working on the case who had to take immediate emergency action for fear of a client being wrongfully removed to imminent danger. The stress of operating in a system where clients can be suddenly disappeared takes a significant toll on staff morale, and the need to be constantly pivoting between these types of emergencies leads to burn-out. Finally, the lack of information in ODLS in Sarah's case also created the need for substantial emergency work, not only for FIRRP but for all parties and for the court that had to deal with emergency motions and filings that would have been unnecessary had Sarah's detention location been available.

*Ability to identify class members*

51. Fourth, the ODLS policy change will very likely undermine FIRRP's ability to represent individuals found incompetent to represent themselves before the immigration court, under *Franco-Gonzalez* and the NQRP. This contract provides a fixed budget based, in part, on how many new cases we accept each fiscal year. FIRRP currently has 80 open cases in which we are appointed as counsel under the *Franco-Gonzalez* injunction and

[3] Note that I am using a pseudonym here to protect the client's confidentiality.

NQRP. I have provided legal services under the *Franco-Gonzalez* injunction since it has been in place. In my experience, a significant number of FIRRP's *Franco-Gonzalez* clients have past orders of removal such that they were in reinstatement or eligible to be placed in reinstatement of removal.

52. *Franco-Gonzalez* establishes specific screening procedures that DHS must follow to identify individuals who may be entitled to appointed counsel under the injunction. It also establishes procedures — so-called third-party notifications — by which non-parties can identify individuals who may be class members to the immigration court.

53. Unfortunately, in Arizona, the mandated DHS screening procedures often fail to timely or properly identify individuals who are potential class members.[4] Given DHS's long history of failing to properly and promptly identify potential class members in Arizona, FIRRP routinely interacts with individuals who may qualify for *Franco-Gonzalez* protections yet have not been identified by DHS. Thus, following the third-party notice procedures from *Franco-Gonzalez*, FIRRP must flag such individuals to the immigration court.

54. Since many of these individuals were deleted from ODLS, our ability to identify potential class members has been hindered. The ODLS policy change has made our legal orientation presentations more difficult to schedule since we often cannot identify people's detention locations, so individuals who are subject to reinstatement may never be located to add to a legal orientation. Additionally, those with serious mental health conditions are significantly less likely to be able to reach out to FIRRP proactively to

[4] *See Franco-Gonzalez v. Holder,* No. CV 10-02211 DMG, Dkt. 1072 (C.D. Cal. Jan. 10, 2020) (reopening discovery and citing four cases from Arizona in finding that "the record before the Court is more than adequate to raise serious questions about potential ongoing noncompliance with the mandatory [DHS screening and identification] procedures outlined above").

seek legal assistance and, even if they do reach out, they are less likely to be able to provide accurate detention location information to enable scheduling a legal visit or orientation. Thus, the FIRRP staff is reaching meaningfully fewer potential clients. . As a result, the new policy will result in fewer eligible individuals being properly identified as *Franco-Gonzalez* class members and being appointed counsel if FIRRP is never able to locate them. In turn, the ODLS changes severely impair FIRRP's ability to file, where needed, third-party notices regarding such vulnerable individuals' mental health conditions.

*Threats to organizational funding*

55. Finally, the ODLS policy change will also negatively impact FIRRP's funding. FIRRP's funding comes from various sources including a federal sub-contract to provide representation to those deemed mentally incompetent under *Franco-Gonzalez* and the NQRP. Funding under the NQRP is specifically tied to the number of clients FIRRP can represent in a year. Changes in the ODLS will likely result in a reduction of FIRRP's number of cases under NQRP and *Franco-Gonzalez*, and a corresponding reduction in funding. Because FIRRP is the primary provider of *Franco-Gonzalez* and NQRP legal services in Arizona, this harm could potentially amount to the loss of thousands of dollars in revenue based on FIRRP's fixed-rate contract with the government for such representation.

56. In sum, ICE's intentional disappearance of noncitizens with final orders of removal from ODLS has drastically impaired FIRRP's ability to perform our core services and directly undermines our ability to fulfill our mission.

I declare, under the penalty of perjury, that the foregoing is true and correct.

Executed on November 3, 2026, in Flagstaff, Arizona.

______________________________
Laura St. John, Legal Director
Florence Immigrant & Refugee Rights Project
P.O. Box 86299
Tucson, AZ 85754