**DECLARATION OF LILAH R. THOMPSON,**
**IMMIGRATION LEGAL PRACTICE,**
**DEFENDER ASSOCIATION OF PHILADELPHIA**

I, Lilah R. Thompson, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. I am a licensed attorney in the State of Pennsylvania. I am the Chief of the Community Defense Unit (Immigration Legal Practice ("ILP")) at the Defender Association of Philadelphia. Previously, I served as Supervising Attorney of the Pennsylvania Immigrant Family Unity Project ("PAIFUP") at the Nationalities Service Center ("NSC"), a nonprofit legal service and refugee resettlement agency in Philadelphia, Pennsylvania. For the past six years, I have provided and supervised *pro bono* representation of individuals in removal proceedings before the Executive Office for Immigration Review (EOIR), with a focus on individuals in immigration detention.

3. I am a member in good standing of the State Bar of Pennsylvania. I am also admitted in the Eastern and Middle Districts of Pennsylvania, as well as the Third Circuit Court of Appeals. I have practiced as an immigration attorney for six (6) years in the State of Pennsylvania. Prior to practicing law in Pennsylvania, I completed a two-year clerkship with EOIR at the New York Immigration Courts, which heard both detained and non-detained cases. I then transferred to be an attorney advisor with the Philadelphia Immigration Court, where I worked for the judges on the non-detained docket in Philadelphia and the detained docket in York, PA for six months.

4. Over the course of my career, I have represented or supervised the representation of approximately 150 clients in detained and non-detained removal proceedings in immigration courts and before the Board of Immigration Appeals ("BIA"). In my current capacity as the Chief of ILP, and formerly as the Supervising Attorney at NSC, I supervise the staff attorneys in their representation of their detained clients in removal proceedings, and I also oversee petitions for writs of habeas corpus that they file. Since December 2025, I have supervised the filing of over three hundred (300) habeas petitions. I have also served as the Chair of the EOIR Liaison Committee for the Philadelphia Chapter of the American Immigration Lawyers Association ("AILA") since 2020.

**ILP's Mission, Services and Communities Served**

5. ILP provides *pro bono* representation to noncitizens detained by U.S. Immigration and Customs Enforcement ("ICE") and continues that representation when individuals are released from custody. Because ILP is the only pro bono provider in the Commonwealth of Pennsylvania with funding to provide direct legal representation to detained noncitizens, we receive a lot of inquiries and requests for assistance from community

organizations, impacted community members and their families, and other legal service providers and attorneys. Additionally, because I am a liaison with the Immigration Court for the Philadelphia Chapter of AILA, I am in frequent—often daily—communications about detentions of community members that my office does not represent, so I am able to observe trends of detention for our clients, *pro se* individuals, and those represented by private counsel.

6. In addition to direct legal representation, ILP also regularly conducts Know Your Rights training in detention facilities and for those out of detention. Because of increased detention in the region, ILP attorneys and staff have begun regularly meeting with current and prospective clients in-person at the Federal Detention Center ("FDC") in Philadelphia, PA. FDC is a temporary detention location, and individuals are typically transferred shortly after their arrival to other facilities in Pennsylvania—Moshannon Valley Processing Center, Pike County Correctional Facility, FCI Lewisburg, and Clinton County Correctional Facility—or to another state.

**ILP's Use of ODLS to Locate and Assist Detained Individuals Before the ODLS Policy Change**

7. ILP frequently relies on the ICE online detainee locator system ("ODLS") when providing adequate legal services, support, and consultation services. The disappearance of people with final orders of removal has disrupted our ability to provide these services. For example, ILP recently had problems communicating with a prospective client, R.B., a trans woman from Liberia with a grant of protection under the Convention Against Torture ("CAT"). At first, R.B. showed up in ODLS because ILP came into contact with her before the system's change on September 15, 2026. And even with her showing up in the system, she was moved so frequently that our attorneys had difficulty actually locating her to speak with her by phone or video call because of delays in the ODLS updating to reflect her actual location. We initially tried scheduling an appointment to speak with her at a facility in Pennsylvania, but before our scheduled call, she was transferred to a detention facility in Texas. While we were ultimately able to get in contact with her by finding her through the ERO eFile system[1]. R.B. was then moved again and we lost touch with her because we could not determine where she was. Since the ODLS policy change, we have checked the system regularly to see where R.B. is being detained, but she does not appear in any searches. ILP has not been able to determine R.B's location or whether she is still detained or has been removed. Because of this, we have not been able to file a habeas petition or a motion to reopen related to fear

[1] ICE's Enforcement and Removal Operations ("ERO") developed the online system, ERO eFile, which is a platform for the filing of electronic G-28s with ERO and the scheduling of legal visits through ERO eFile's Detention Facility Appointment Scheduler ("DFAS"). This is only available in ICE detention facilities, not federal detention centers that hold noncitizens, or most county facilities with contracts to hold ICE detainees. Thus, if an individual is not in an ICE facility, they cannot be scheduled through ERO eFile and therefore will not be found in any searches on ODLS.

of return to a third country or even talk to R.B. about her wishes or whether she is getting the medical care she needs.

8. For clients who are frequently transferred, of which now there are many, having access to ODLS is crucial. Oftentimes, it is difficult for them to make phone calls to their attorneys or family members as access can be limited, and the funds on the phone system often do not move with them. Therefore, without ODLS, it can be nearly impossible to locate a client in time to provide responsive services.

9. Additionally, a significant portion of ILP's work involves providing accurate information to pro bono partners and callers. As part of this process, ILP attorneys use ODLS to locate detained individuals. Recently, we had a community member reach out to us and express concerns that their family member, who is subject to a final order of removal, was not showing up in ODLS. They were greatly distressed by the inability to figure out where their family member was or if they were even still in the U.S. Usually, we would be able to use ODLS to find out this information and provide some transparency to community members, however, now that ODLS has removed any information regarding detained individuals with final orders of removal, we can no longer provide this service adequately.

**Effects of the ODLS Policy Change on ILP's Services and Operations**

10. The ODLS change has made it difficult for us to provide proper legal services because we are not able to access our clients and provide legal advice. We cannot communicate with our clients if we do not know where they are.

11. For example, I have represented a long-term client from Liberia, L.J., since December 2022. He was a former child soldier in Liberia who faced horrific violence and was diagnosed with post-traumatic stress disorder ("PTSD") and schizophrenia. He was granted protection under CAT in August 2023, and was later released from custody in October 2023, after the U.S. government determined they could not safely remove him to a third country. L.J. was released on an Order of Supervision ("OSUP").

12. On September 16, 2026, L.J. was re-detained by ICE, likely for purposes of a third-country removal. Oftentimes, individuals from Liberia who are removed are sent to Ghana, where they are ultimately forcibly repatriated to their home countries, which is in violation of their protection orders.[2] Because ODLS no longer registers individuals with

[2] Rukanga, Basillioh, *US deportations to African countries unlawful and exploit suffering - rights group*, BBC NEWS (Oct. 8, 2026), https://www.bbc.com/news/articles/c9p8gn55433jo ("In Cameroon, Equatorial Guinea and Ghana, the deportees had been sent to their countries of origin despite the risk of 'violating the principle of nonrefoulement

removal orders, I could not locate L.J. to see if he was, in fact, taken into ICE custody, and if so, where he was being detained. When I looked for L.J. using his A-Number and country of origin, I got "0 results." This could either mean he was not in custody or he was detained, likely for purposes of a third-country removal, which can happen quickly. The latter possibility is particularly troubling because L.J. suffers from extreme mental illness and needs appropriate medication to limit his audio and visual hallucinations and so that he does not attempt to die by suicide, which he has done before during periods of detention when his medication was withheld. In the past, I have been able to talk to the detention facility medical staff and warden to ensure that L.J. is being given the correct medication to treat his serious conditions and being observed for potential harm to himself. I was initially alerted to his detention because his name appeared in the Bureau of Prisons ("BOP") locator, which I checked on September 20, 2026. It stated, though, that he had been "released" from BOP on September 20, which could have meant transferred or released out of custody. My team and I tried other systems to locate L.J. in detention, including ERO eFile, GTL, and access corrections (for commissary), but he did not show up anywhere. I suspect this is because, as I found out later, he was transferred multiple times, including to facilities that do not have the ERO eFile system, like the Federal Detention Center in Philadelphia, Pennsylvania and the Alexandria Staging Facility in Louisiana. Because I could not find him for over a week, I assumed that he was not in ICE custody and that my suspicions about his impending deportation were incorrect. I tried to call his cell phone repeatedly and speak with some of his contacts, but got no response. I was told by someone close to him that they had last spoken to him in early September, so I hoped he would get in touch soon and that I was mistaken about his detention.

13. Almost a month later, on October 18, 2026, I was finally able to locate L.J. at the Central Louisiana ICE Processing Center in Jena, Louisiana through the ERO eFile system. I immediately scheduled a call with him for October 20, the first appointment the facility had available. I learned from L.J. that even though he begged the ICE officers at the detention centers to allow him to call me, they refused, and he did not have my number memorized so he could not reach me himself. He was never able to adequately access the phone systems because they moved him so quickly from the various facilities. I also learned that the government had tried to deport L.J. to Rwanda, a third country, without informing us. Though L.J. had not been removed, the entire process had been extremely distressing for him, and he had not received his medication for days at a time while he was moved to various facilities. Had I not known to use ERO eFile or if the detention center he was transferred to did not utilize the system, I fear I would still be unable to

[that people should not be sent to a country where they face torture, cruel treatment, or threats to their life and freedom].'").

locate him to provide any advocacy, legal consultation, advice on challenging the conditions of his confinement, or represent him in a habeas petition to address any attempt to remove him to a third-country and potential repatriation to the country where he has protection from deportation.

14. On the evening of October 20, the same day that we finally made contact with L.J. in detention, he called me to tell me he was being transferred to the Alexandria Staging Facility in Louisiana for third-country deportation. I then could not schedule any further calls with him through ERO eFile or track his location, because the ALexandria Staging Facility does not use ERO eFile. I repeatedly reached out to ICE through various officers, the Deputy Field Office Director, and the staff at the detention facilities, but could not get any information–ICE would not answer the phone or respond to my emails and the two facilities that he could have been at were not able to confirm whether he was there or had been transferred elsewhere. These facilities repeatedly referred me to ICE, who did not answer the phone or respond. Because we needed to take emergency action, I filed a habeas petition and temporary restraining order in the Western District of Louisiana, though we did not know with certainty whether L.J. was in that jurisdiction or not. After repeatedly searching for L.J., I found out on October 23, 2026 that he had been deported to Eswatini and taken directly to a prison. At approximately 2:15PM, L.J. called me to advise me that he had landed in Eswatini and was being held at a prison. Prior to his deportation, he repeatedly requested that ICE contact me to advise me of his location and request the status of his habeas and TRO. ICE incorrectly told L.J. that his lawyer had not filed anything on his behalf and that ICE was in direct communication with me regarding his deportation. Upon arrival to Eswatini, L.J. was asked if he wanted to be repatriated to Liberia, where a U.S. immigration judge had already found he would be tortured.

15. ILP has had a number of clients with medical conditions who have been transferred after September 15, 2026. These clients require urgent medical attention and treatment. Without being able to locate them expeditiously, we are not able to ascertain their wellbeing and whether they are receiving the medical care they need. For example, we have a client who is diagnosed with HIV and takes antiretroviral therapy in order to control the virus and protect his immune system. He is not post-order, so we have been able to track his location as he is moved from one facility in Pennsylvania to another and ensure that he is getting the proper medical treatment at each facility he is transferred to. If he were post-order, we would not be able to do this essential advocacy.

16. Moreover, part of ILP's practice includes filing petitions for writs of habeas corpus on behalf of our clients to challenge the lawfulness of their detention. We cannot file these petitions when we do not know their location. Generally, a habeas petition can only be

filed where an individual is being detained. For example, in August 2026, ILP had a client, A.R., who had a grant of protection under CAT who was transferred from Moshannon Valley Processing Center ("Moshannon") in Pennsylvania to a detention facility in Michigan right before we intended to file a habeas petition on his behalf. Thankfully, this client was able to call us from the new detention facility so we were able to wait and file his petition in the correct venue. Before September 15, 2026, A.R. was showing up in ODLS. After September 15, he stopped appearing in any searches even though he was still detained. The federal district court ultimately ordered his release on September 18, 2026. Because ODLS no longer registered him, we could not locate him to determine if he was still at the facility (in violation of the release order) or had been released pursuant to the order. Given that A.R. was a Pennsylvania resident, coordinating his return from Michigan to Pennsylvania without knowing where he was or whether he was still in custody was difficult. Luckily, A.R. was able to call us from the facility to let us know where he was and from there ILP facilitated his release.

17. Not all clients are able to call us to inform us where they are being detained. This information is critical to ILP's ability to file the appropriate habeas petitions, other emergency federal court action, provide medical advocacy, or facilitate their release. Since the ODLS policy change, ILP now has to contend with the fact that we could be filing a habeas petition or motion for a temporary restraining order ("TRO") in the wrong district, causing undue delay to the client's case and contributing to confusion in an already overburdened federal court system. This is difficult not only for us, but for the judges who adjudicate these cases and the Assistant U.S. Attorneys who liaise with ICE when courts issue orders barring deportation or transfer. For example, ILP represents a client, S.I.F., who is illiterate and only speaks the rare language of Zarma. In order to communicate effectively with him, we need to speak with S.I.F. via an interpreter, which prohibits him from calling us in emergency situations using the phones in the facility. In February 2026, S.I.F. was transferred suddenly from Moshannon to Dulles Airport in Virginia for imminent removal. ILP filed an emergency action with the Eastern District of Virginia to stop his removal. In our federal filing, we attached a screenshot of an ODLS search which provided the location of S.I.F.'s detention and the number for the Field Office that was in charge of his case. Our TRO barring his deportation or transfer was granted. ILP was only able to effectively get S.I.F. taken off of the plane because we were able to identify where his last location was and contact the ICE Field Office facilitating his deportation.to communicate the judge's order staying his deportation by using ODLS. If we did not have access to ODLS, and despite the emergency application being granted, S.I.F. would have surely been removed and ILP would have no way of locating him.

18. ILP, as part of the Defender Association of Philadelphia, also provides legal advice on individuals' criminal cases as part of our constitutional obligation under *Padilla v. Kentucky*, 559 U.S. 356 (2010), to advise noncitizens of the consequences of a guilty plea on their immigration status. Some of our clients are individuals with final orders of removal, withholding of removal, or protection under CAT. ICE often detains these individuals in the middle of their criminal proceedings, either on their way to court or near the courthouse. In the past, we were able to check ODLS to determine if an individual had been detained by ICE and then later provide that information to the criminal court to explain why the individual was not able to present themselves at a hearing. Now, there is no way to confirm and provide that information. As a result, some clients in criminal cases are receiving bench warrants because ILP has no way of showing that they cannot appear in the criminal case because they have been detained by ICE. Criminal court judges often require proof of someone's detention and subsequent deportation before lifting a bench warrant; since the ODLS policy change it has become extremely difficult to meet this burden.

**Ongoing Effects of the ODLS Policy and How Restoring Access Would Address Them**

19. ILP also provides specialized post-order consultation and representation to individuals in ICE custody who have grants of withholding of removal or protection under CAT, or who are otherwise post-order from countries where they cannot be deported due to U.S. relations. When the government continues to detain these individuals after they are granted this relief, re-detains them to effectuate third country removal, or attempts to deport them to a country where they have not yet secured travel documents, ILP often steps in to advise the noncitizen of their rights or represent them in seeking release from custody through habeas petitions.

20. Our office receives these referrals from community-based organizations and detainees' family members and we schedule consultations with individuals in detention or meet with them in-person during our know your rights trainings at detention facilities. When we obtain their information, we place them on a list and begin to track the length of their detention and the location of their detention to determine where and when we can file habeas petitions for them based on their unlawful, prolonged detention under *Zadvydas v. Davis*, 533 U.S. 678 (2001). Many of these individuals experience lengthy periods of detention while the government attempts to get travel documents for them (which for many they cannot), and would otherwise be eligible to seek release from custody on this basis. However, because ILP cannot locate them on ODLS, we cannot meet with them or know whether they are still detained such that we can pursue potential legal action on their behalf.

21. For example, our office recently traveled to the Moshannon Valley ICE Processing Center, a GEO facility, to meet with post-order individuals to do in-person consultations. We received information about some of these individuals from family members or other legal service providers who had identified them as vulnerable individuals needing assistance. One such individual, K.K., is a post-order individual from Afghanistan with a U.S. citizen wife and a child with special needs, who had a pending application to adjust his status. He did not show up in the ODLS because he is post-order, but was showing up in the ERO eFile system on October 19, 2026 at 9:00 pm, so ILP made plans to meet him the next day, on October 20. However, when we arrived at the facility, GEO officers informed us he was not there, and had actually been transferred out of the facility on October 14, 2026, but could not tell us where he was. The GEO officer shared that the ERO eFile system is often not consistent with the internal GEO system. Our office had been planning on meeting with him to file a habeas petition, but given we did not know his location and he was not at the detention facility where we planned to meet with him, we were unable to offer this service. We later found out from his wife that he had been transferred to Louisiana for potential third-country removal.

22. Now that individuals subject to removal orders are no longer showing up in ODLS searches, we do not know whether they are still detained, have been transferred, or have been deported. This makes it extraordinarily difficult for us to find them, speak to them, and represent them in any applicable post-order representation for which they would be eligible. The ODLS policy change is particularly troubling for individuals who have protection against deportation, like a grant of withholding or CAT, because the government is often unable to secure removal to a third country and simultaneously cannot deport them to their countries of citizenship. These individuals languish in detention with no recourse other than a petition for a writ habeas corpus, challenging their unlawful detention. Most times, they need an attorney's assistance to navigate this process. Thus, if ILP is not able to identify members of this vulnerable population more readily—where they are being detained and how we could communicate with them—we cannot aid them in vindicating their lawful right to seek release from custody.

Executed on 23 of October, 2026, at Philadelphia, Pennsylvania.

Lilah R. Thompson, Esq.