**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GREATER BOSTON LEGAL SERVICES, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, et al.,<br><br>*Defendants*. | No. 1:26-cv-14869 |

**DECLARATION OF AIMEE MAYER-SALINS**

I, Aimee Mayer-Salins, make the following statements under penalty of perjury that the following statements are true and correct, pursuant to 28 U.S.C. § 1746:

1. My name is Aimee Mayer-Salins, and I am the Deputy Program Director for Legal Coordination for the Detained Adults Program at Amica Center for Immigrant Rights ("Amica Center").

2. I am an attorney licensed to practice law in the states of Massachusetts and Virginia. In addition, I am admitted to practice before the United States District Court for the District of Massachusetts; the United States Courts of Appeals for the First, Third, Fourth, Seventh, and Eleventh Circuits; as well as the United States Supreme Court. I was first admitted to the Virginia State Bar in 2013. I was admitted to the bar in Massachusetts in 2016.

3. I have practiced immigration law for my entire career. I began my career at the United States Department of Justice ("DOJ"), entering on duty through the Attorney General's Honors Program in 2013. At DOJ, I served at the Board of Immigration Appeals ("BIA") within

the Executive Office for Immigration for Review ("EOIR"). I then completed a fellowship at the Post-Deportation Human Rights Project at Boston College. After that, I was an associate attorney at Rubin Pomerleau, P.C. and then at Fragomen, Del Rey, Bernsen, & Loewy, LLP. I then worked at the Catholic Legal Immigration Network, Inc. ("CLINIC") from 2019 through 2022, first as a staff attorney and then as a supervisory senior attorney.

4. I joined Amica Center in September 2022 as the Managing Appeals Attorney but was promoted to Deputy Program Director in August 2026. In my current position, I work closely with other managers and staff to manage and support the Detained Adults Program ("DAP") by (i) ensuring adequate coverage and programmatic response to legal issues confronting the people DAP provides legal services to in detention; (ii) connecting the on-the-ground experiences and issues observed in DAP to civil litigation and other legal efforts to enact systemic change; (iii) supporting the program's provision of services as a whole through supervision and mentorship of staff, program planning, and casework and pro bono mentorship as appropriate. I also serve as a member of Amica Center's organizational Leadership Team and help set organization-wide priorities and policies.

**Our Organization**

5. Amica Center is based in Washington, D.C., and provides legal services to immigrants across the United States. Our mission is to confront the impact that the unjust immigration system has on our clients and communities through direct legal representation, detained know your rights programs, pro se support, impact litigation, education, and client-centered advocacy.

6. After our start as a project within the Washington Lawyers Committee for Civil Rights and Urban Affairs, Amica Center became an independent non-profit in 1999. Over the next

couple of decades, our geographic footprint has expanded from representing people solely in the Washington Capital Region to working with clients from the Capital Region detained throughout the country.

7. Amica Center has three client-facing programs: the Detained Unaccompanied Children's Program ("DUCs"), the DAP, and our Immigration Impact Lab ("Lab").

8. The Department of Homeland Security's ("DHS") sudden decision to no longer include individuals with final orders of removal in its online detainee locator system ("ODLS") has resulted in a significantly reduced ability to perform core Amica Center services, including representing clients, taking new cases, and supporting pro se litigants. This change has most notably impacted DAP and Lab.

9. DAP represents detained noncitizens before the immigration courts, BIA, U.S. Citizenship and Immigration Services ("USCIS"), federal district courts, and federal circuit courts; provides robust mentoring to pro bono attorneys that we match with detained noncitizens; and conducts know your rights programs in detention centers about immigration court, BIA, habeas corpus petitions, and the general deportation process so that individuals can make more informed decisions about their cases.

10. Lab specializes in strategic and appellate litigation, bringing cases to defend and strengthen legal protections for immigrant rights. Lab attorneys represent detained noncitizens before the federal district courts, federal circuit courts, and BIA. Among other things, Lab attorneys litigate affirmative lawsuits in federal district court on issues affecting detained noncitizens, including detention conditions and habeas petitions on a range of claims such as third country removals, bond eligibility, warrantless arrests, and indefinite detention.

11. DUCs focuses on offering legal services and representation to unaccompanied immigrant children held by the Office of Refugee Resettlement ("ORR") at ORR-subcontracted facilities, including shelter and foster care programs, as well as children in ORR Unaccompanied Refugee Minor ("ORR URM") programs in the greater Washington, D.C. and Baltimore areas. Many have faced abuse, neglect, trauma, and separation from family. In addition, DUCs senior and managing attorneys mentor pro bono attorneys handling pro bono cases representing unaccompanied children.

12. Amica Center currently represents approximately 1,325 clients across all programs. Excluding the unaccompanied children represented by our DUCs program (because unaccompanied children are held in ORR custody, rather than ICE custody), Amica Center has about 550 adult clients. Of those adult clients, approximately 105 currently have final orders of removal. When I say final orders of removal, I mean a reinstatement order issued pursuant to 8 U.S.C. § 1231(a)(5), a final administrative removal order issued pursuant to 8 U.S.C.§ 1228, or an administratively final order issued in proceedings conducted under 8 U.S.C. § 1229a (also known as "240 proceedings" based on the corresponding section of the Immigration and Nationality Act). The group of people with final orders of removal includes people who were granted withholding of removal or protection under the Convention Against Torture ("CAT"). We also represent approximately 112 people in BIA appeals.

13. Noncitizens with final orders of removal frequently need legal representation on matters such as withholding-only proceedings before the immigration court, motions to reopen or reconsider, petitions for review before the circuit courts, habeas petitions before U.S. district courts, or advocacy regarding medical needs or conditions of detention. Additionally, there are those who may need deportation support both from our social services team as well as from

attorneys advocating for a safe release (even when that release is a removal from the United States) or advocating for a swift removal so that a client does not continue languishing in detention.

14. Amica Center also does quite a bit of affirmative litigation on behalf of detained noncitizens. For example, we are currently litigating warrantless arrest cases in Maryland and Washington, DC. *Guzmán v. DHS*, No. 1:26-cv-03579 (D. Md. Sept. 9, 2026); *Escobar Molina v. DHS*, No. 1:25-cv-03417 (D.D.C. Sept. 25, 2025). We are also litigating conditions in the holding cells operated by ICE in Baltimore (colloquially known as the "Baltimore Hold Rooms"). *D.N.N. v. Baker*, No. 1:25-cv-1613 (D. Md. May 9, 2025). The plaintiffs in *D.N.N.* have final orders of removal, and we relied on ODLS to know their location in order to file that lawsuit. Had the ODLS policy change already been in place at the time of filing, we likely would have been unable to file.

15. Amica Center relies on ODLS for several purposes related to our core work. *First*, for currently detained clients whom we are already representing, we use ODLS to identify and continuously track where they are physically located. People who are in ICE detention—especially people with final orders of removal—are frequently transferred between ICE facilities. If, for whatever reason, we were unable to reach a detained client in the past, we would be able to check ODLS to figure out where a person with a final order had been transferred to. Whether we are representing someone before EOIR, before a circuit court, in a habeas corpus petition, or in advocacy regarding conditions, safe release, or preparations for removal, ODLS is an essential tool for Amica Center to know where our clients are, which in turn is essential for us to be able to represent them.

16. *Second*, ODLS is critical for our affirmative litigation on behalf of detained noncitizens. Without access to ODLS, Amica Center staff face huge hurdles to establishing contact with potential plaintiffs, witnesses, or class members in litigation regarding conditions of confinement or other issues affecting ICE detainees. In some instances, it may end up proving impossible to contact potential plaintiffs or witnesses for this type of litigation.

17. *Third,* ODLS is an essential part of our intake process. The first step in Amica Center's representation of a client is intake. The intake team receives referrals from community members, family members of detained noncitizens, local government officials, and other nonprofits. We also frequently receive calls from people who are detained. Amica Center operates a detention hotline, which detained noncitizens in certain facilities can call for free. In most facilities, detained noncitizens must use the money in their commissary to call out, unless we already know they are there and are able to set up a confidential legal call. The first thing the intaking team does when they learn that a potential client is detained is to look the person up on ODLS. It is critical for Amica Center to know the location of any potential new client because without the client's location, it is impossible to communicate with the individual to learn whether the person is even eligible for our services, what their case posture is, and whether they want Amica Center representation. If we cannot find them, we cannot set up a legal call to intake them. And without an intake, it is impossible for Amica Center to offer representation to detained individuals.

**Impact on Our Current Clients**

18. Around September 15, 2026, Amica Center attorneys and other staff members began noticing that our detained clients with final orders of removal were not appearing on ODLS. We learned very quickly that other legal service providers around the country were experiencing the same thing. Over the past month, our clients' disappearance from ODLS has made it much more difficult for our attorneys to locate them. The difficulties in locating and contacting our detained clients have in turn made it harder for us to provide the legal services and other forms of support that we are dedicated to providing to each of our detained clients and prospective clients.

19. Some of the most troubling impacts of the ODLS policy change have been felt by attorneys representing medically vulnerable clients or clients with significant mental health challenges. In these cases, Amica Center often has to engage in intensive advocacy with ICE and the medical or mental health service providers at the detention facility to ensure that our detained clients receive the care they need.

20. One Amica Center attorney represents a client with a final order of removal who had been in detention pending removal and who broke his knee on September 13, 2026. His removal order became final on September 25, 2026. The client asked to be swiftly removed so he could receive medical attention in his country. Like other people with final orders of removal, this client stopped appearing on ODLS around the time his removal order became final. A few days later, the client was transferred to a new detention center across the country in Louisiana. In this case, the attorney received a detainee transfer notification on the Enforcement and Removal Operations ("ERO") portal for this transfer. However, a few days later, he was transferred to another Louisiana facility. This time the attorney did not receive a notification

about the second transfer on the ERO portal, so she had no way to know her client had been moved. The client was able to call his sister to tell her he was in a new facility, but he did not know which one. At the same time, the Amica Center attorney remained unable to figure out where the client was being detained using ERO portal. After that, Amica Center did not hear from the client for three days, until he wrote to his attorney on Whatsapp from the country he had been removed to. Because we could not track our client's transfers on ODLS and did not have a reliable alternative to figure out where he was, we were not able to support his family with coordinating someone to receive him after removal and help him travel to his grandparents in that country. As we try to do in every case where a medically vulnerable client is pending removal, Amica Center had been trying to provide the client with the pre- and post-removal services that he needed, but the ODLS policy change prevented us from doing so.

21. Another Amica Center attorney on DAP has a client with a final removal order who was granted protection under CAT last year. This client has been in ICE custody since that time and has a fully-briefed habeas petition pending in district court. Due to the policy change, the client no longer appears in ODLS. ICE is generally unresponsive to her attorney's inquiries about the status of her case, but the attorney learned in August that ICE intends to remove the client to a third country (i.e., a different country than the one she is a citizen or national of). Removal to a third country raises very serious due process concerns, particularly because ICE provides very little notice of potential third country removal, so it is imperative that we know immediately where our client is if a third country removal is about to happen. We need to know where the client is so we can communicate with them concerning whether they want to file a habeas petition to fight the third country removal, whether they have a fear of being sent to that third country, and what the basis for that fear is.

22. Because this client is not appearing on ODLS, her attorney has been trying to keep track of her location through weekly calls and has requested that the client call every day to confirm her commissary account is still open. The weekly phone calls are an inefficient and unnecessarily time-consuming way of making sure we know whether our client is still in the country. The client is unable to call every day because of phone availability and because her mental health is severely deteriorating and some days, she just cannot even bring herself to use the phone. The attorney also checks the GettingOut application, which allows detained noncitizens at certain ICE facilities to connect to people on the outside, to see if her client can still message her. The attorney's only other way to have any sense of whether her client might be on a flight to some unknown country halfway around the world, rather than simply in a different ICE detention facility, is through emails from other advocates representing individuals facing third country removal or by checking the ICE Flight Monitor, an initiative that tracks and documents U.S. immigration enforcement flights. ICE has taken away the one tool that was available for Amica Center to efficiently and quickly confirm that our client is still at the detention facility in the U.S. or whether she has been transferred out.

23. Even relatively simple cases are now presenting serious challenges due to our diminished ability to locate our clients and to communicate with them. For example, Amica Center received a referral for someone who had been waiting in detention for a long time just wanting to be removed to his country of origin, but ICE was not providing him with any information about when his deportation would happen. Amica Center agreed to take on representation to provide advocacy during the removal process. On September 17, 2026, his family and the referrer were panicking because he had suddenly disappeared from ODLS, but they had not heard anything from him. A staff attorney called the detention center and confirmed

he was still at the same facility and then scheduled a call through the ERO eFile platform to confirm nothing had changed with his status. The client eventually accepted representation for deportation support, and we were able to facilitate his removal to Venezuela. However, throughout the process, his family had no way of tracking where he was as he was moved from a California detention center to a staging facility in Texas and then ultimately to his country of origin. The attorney could check his location by scheduling calls on ERO eFile (or starting to schedule one to see if he showed up), because those facilities happened to participate in it. But that would become impossible if ICE transferred the client to one of the many facilities that do not participate in ERO eFile, and it provides no relief to his family and community, who do not have access to the system..

24. The ODLS policy change has already, in a short period of time, impaired Amica Center's ability to advocate for our clients that are seeking a variety of forms of assistance which comprise our core work. If the policy continues, we can expect more and more of our clients to disappear and for our ability to locate them to be almost impossible. ODLS used to provide an easy and efficient way to track our current and prospective clients. As the cases above show, there have already been instances where we have been unable to provide services that our clients requested and that DAP exists to do. These trends will persist the longer the new ODLS policy remains in effect.

**Impact on Our Ability to Conduct Intakes**

25. DHS's new policy of removing people from ODLS has created a nightmare for our intake team. The policy significantly complicates Amica Center's ability to locate and ascertain the case postures of potential clients. In the past, if a person did not show up in ODLS, it was relatively safe to assume they were no longer in ICE custody or were being transferred to

a new detention facility and that they would appear in the ODLS within a short period. Now, it is just as likely that the potential client is someone with a final order who may have ongoing legal proceedings and who will remain in ICE custody for a significant time period but will never show up in ODLS.

26. After receiving a referral, the intake team will attempt to communicate with the potential client. Since the intake paralegals cannot ascertain where someone who has disappeared from ODLS actually is, they are frequently contacting detention centers across the country, including facilities that we do not often work with, to try to trace down potential clients. This process is time consuming and oftentimes garnishes no results. For example, it is much more difficult to confirm that an individual is being held at a facility in California or Texas rather than at one of the Virginia facilities where we have regular visits and can check commissary accounts.

27. Overall, the new ODLS policy makes it very difficult to figure out not only a person's location, but also their case posture because now it can be completely unclear why a person is not showing up, especially if the person also does not appear on the automated case information system ("ACIS") operated by EOIR. When a person does not appear in ACIS, it is possible that the person received a final administrative removal order, was determined to have a reasonable fear, and accordingly was placed in withholding-only proceedings before an Immigration Judge. In that scenario, the person may need representation in immigration court from Amica Center, but if we are unable to locate the person we cannot offer that representation.

28. Similarly, we have a client who received a reinstatement order and was determined to have a reasonable fear. At first, we were unable to locate the individual to offer representation for withholding-only proceedings. However, the same client later called Amica

Center once he was in a detention facility where our hotline number is posted and where our team regularly visits, and we were able to offer representation. Likewise, people in other procedural postures may need representation in district court habeas proceedings or before USCIS—if we cannot locate them, we cannot offer representation.

29. Without ODLS, our intake paralegals often have no reliable way to locate someone referred to Amica Center. For example, during the week of October 5, 2026, one intake paralegal spent over two hours trying to find one person who was referred to Amica Center by a mutual aid group. At the time of the referral, the individual was at the Farmville Detention Center in Farmville, Virginia, but was quickly moved. The mutual aid group relayed that they thought he may have been moved to California. He did not appear in ODLS or ERO eFile, the latter of which tends to be the main workaround that the intake paralegals have been using to try to locate people detained at participating facilities who do not appear in ODLS. Since he did not appear in ERO eFile, the intake paralegal called the Detention, Removals, and Information Line (DRIL) hotline and it took them 24 hours to locate the person and send the phone number to the San Francisco ICE field office and a link to ODLS. The detained person was being held at a detention center in California that should appear on ERO eFile, but he was not appearing. The intake paralegal sent an email to the facility asking for confirmation of his whereabouts and to schedule a call. The facility ultimately scheduled the call but did not provide an explanation as to why the detained person was not appearing in ERO eFile.

30. Another intake paralegal is currently trying to find a person who has disappeared from ODLS, presumably because he received a removal order. Before his disappearance from ODLS, the potential client was moved from the Caroline Detention Facility in Virginia to the Golden State Annex in California. The intake paralegal believes he is being transferred again

because a recent scheduled call at Golden State Annex was cancelled, stating that the detainee was no longer there. Our paralegal tried looking up the potential client in ACIS to confirm whether a removal order was entered in the underlying immigration case, but no such order is showing up for him. Given this new ODLS policy, our intake paralegal is also worried the potential client could have been ordered removed, or worse actually removed, and there is no way for her to tell. Amica Center does not have a family contact for him either, and he is not showing up on ERO eFile. Although the paralegal reached out to the ICE San Francisco outreach email, to date she has not received a response. At the moment, all the intake paralegal can really do is keep checking ODLS in hopes that the potential client eventually shows up. Before the recent change in policy, the intake team would have generally assumed that the potential client would appear on ODLS if he was in DHS custody and would not have to have put in this additional effort to locate him.

31. A third member of the intake team just got a referral for someone who is not in the locator, ERO eFile, or ACIS, which means we have no idea which ICE field office to call. The intake paralegal called the potential client's family contact to find out that they had spoken with him two days prior. At that time, he was being transferred to somewhere in Louisiana. The contact person thought he may have signed a deportation order but was not sure. It remains a mystery where the potential client is being detained and what his case posture is. Just a few weeks ago, a referral of this type would have taken less than a minute to assign because we could use ODLS to easily figure out if the potential client was detained and at what facility.

32. If a potential client does not show up in ODLS and we have no family contact, we are frequently unable to offer them representation—even if they are someone who might otherwise fit our case acceptance criteria. Indeed, during our case distribution meeting during

the week of October 5, because of the unreliability of the locator, we almost did not assign someone an attorney because they were not appearing in the locator. We assumed they were either removed or released. But the individual called our hotline shortly after our case distribution meeting and shared that he, in fact, was still in ICE custody and had a final order of removal.

33. In the time since the new ODLS policy went into effect, the intake paralegals have noticed a sudden change in the flow of calls. Previously, the paralegals would receive about a dozen calls per week requesting representation. During the weeks of September 28 and October 5, the two paralegals covering our intake line state that they each received only one call during the whole week they covered the intake line, and the total two calls were from people in criminal custody, not ICE custody. This drop coincided with the implementation of the new ODLS policy. While our hotline is available without charge at some facilities, at many others, particularly facilities far from the Washington, DC region, our hotline is not available for free. Instead, detained people must pay to call someone outside the facility. At some facilities, calls to counsel will not be free or privileged until the lawyer adds their phone number to a privileged phone list. But that of course requires the lawyer knowing where the person is detained.

34. Since families are now unable to locate their loved ones on ODLS, as they previously could, they are also unable to add money to commissary accounts. This means that detained noncitizens at such facilities who, in the past, would have reached out to family or friends by phone to tell them where they were and that they needed a lawyer, often cannot make phone calls and have no way of seeking legal representation. Our intake team has also received calls from family members asking for help locating their loved one after an ICE arrest and for

Amica Center to represent them. Without ODLS, it can often be extremely difficult, if not impossible, to locate the person and offer such representation.

35. DAP exists to offer representation to people in ICE detention. Amica Center has a duty to provide zealous advocacy on behalf of its clients. While our attorneys are always ready to do so in challenging and changing circumstances, we cannot advocate for our clients if we cannot locate or communicate with them.

36. Given the new difficulty of contacting potential clients, Amica Center anticipates that we will not be able to offer assistance over the coming months to people we would normally be able to assist if we, along with our clients and their communities, were not dealing with the disappearance of detained noncitizens with final orders of removal from ODLS.

I declare, under the penalty of perjury, that the foregoing is true and correct.

Executed on November 3, 2026 in Newton, Massachusetts.

Aimee Mayer-Salins, Esq.
Deputy Program Director-Legal Coordination
Detained Adult Program
Amica Center for Immigrant Rights